225 So.2d 497 (1969)
Robert P. JACKSON, W.T. Bright, Joseph D. Buffkin, Fletcher Morgan, Ellis R. Warren and Charles G. Tankersley, Appellants,
v.
The CONSOLIDATED GOVERNMENT OF the CITY OF JACKSONVILLE, Appellee.
No. 37785.
Supreme Court of Florida.
July 22, 1969.
*499 C. Ray Greene, Jr., Jacksonville, for appellants.
William L. Durden, Jacksonville, David U. Tumin and Charles W. Arnold, Jr., for appellee.
ROBERTS, Justice.
Appellants, plaintiffs below, have applied directly to this court for review of a declaratory judgment upholding against at tack on various constitutional grounds, discussed hereafter, the so-called Jacksonville Consolidation Charter. We have jurisdiction of the direct appeal under Section 4, Article V, Florida Constitution, F.S.A.
The case was heard by the Circuit Court of the Fourth Judicial Circuit of Florida. In a well considered opinion authored by the Honorable Thomas A. Larkin, each ground of the attack made by plaintiffs was discussed and disposed of, clearly and succinctly, under impeccable authority and with flawless logic. Instead of re-stating the findings and conclusions as set forth in Judge Larkin's opinion, we will give it the recognition it deserves by quoting from it at length, with approval. His opinion, with deletions in the interest of brevity, follows:
"Plaintiffs individually, and as Duval County Commission and Duval County *500 Budget Commission members and purported Democratic nominees for election thereto instituted this action contesting the existence and constitutional validity of Article VIII, § 9, Florida Constitution, hereinafter called the Jacksonville Consolidation Amendment, and Chapters 67-1320, 67-1535 and 67-1547, Laws of Florida, 1967, hereinafter referred to as the Jacksonville Consolidation Charter, which Charter was enacted by the Legislature and adopted by the electorate of Duval County pursuant to the said Jacksonville Consolidation Amendment. Plaintiffs contend in substance that the Jacksonville Consolidation Amendment to the Florida Constitution has heretofore been repealed by a later conflicting amendment to Article VIII, § 5, thereof, or, in the alternative, that the Jacksonville Consolidation Charter is unconstitutional and invalid in its entirety for a variety of reasons which shall be hereafter discussed. * * *

"Purported Repeal of Article VIII, Sec. 9
"Plaintiffs first contend that the Jacksonville Consolidation Amendment no longer exists, because it was impliedly repealed by the later amendment of Article VIII, § 5, a general section which relates to county commissioners.
"The Legislature specifically relied on the Jacksonville Consolidation Amendment in passing the Charter. If that section had previously been repealed, it was ineffective to authorize the Legislature to enact the Charter. Consequently, this issue is the most crucial one in this litigation.
"In determining this question, it is helpful and material to consider the setting in which the Jacksonville Consolidation Amendment was adopted in 1934. Since the original publication of the Constitution of 1885, Article VIII, § 1 thereof has provided that the state shall be divided into political subdivisions called counties and Article VIII, § 5, thereof has provided that there shall be five county commissioners in each county. An amendment to Section 5 in 1900 permitted the county commissioners themselves to divide their respective counties into five commissioners' districts Consequently, the passage of the Jacksonville Consolidation Amendment in 1934 authorized the alteration of the existing scheme with respect to counties and county commissioners only in Duval County which was its limited field of operation. Its apparent purpose was to permit a partial or complete departure from such existing scheme within Duval County. Article VIII, § 11, was added to the Constitution in 1942 and made certain specific provisions with respect to the County Commissioners of Dade County, particularly concerning their terms of office and which varied from the provisions of Article VIII, § 5, with respect thereto. Section 5 was itself amended in 1944 primarily with respect to the county commissioners' terms of office and such amendment specifically provided that it would not affect the previous amendment relative to Dade County concerning relatively the same changes. These subsequent amendments to Article VIII, § 5, and Article VIII, § 11, did not alter the basic scheme with respect to counties and county commissioners so as to cause the Jacksonville Consolidation Amendment to be anymore inconsistent therewith than it already was.
"Plaintiff contends that the amendment to Article VIII, § 5, was a drastic amendment and that its effect was to repeal the Jacksonville Consolidation Amendment in its entirety. Needless to say, it is possible for one constitutional provision to repeal another, and there is no doubt that this may be done by implication. A new constitutional provision prevails over prior provisions of the Constitution (a) if it specifically repeals them or (b) if it cannot be harmonized with them. Nevertheless, it is settled that implied repeal of one constitutional provision by another is not favored, and every reasonable effort will be made to give effect to both provisions. Unless the later amendment expressly repeals or purports to modify an existing provision, the old and new should *501 stand and operate together unless the clear intent of the later provision is thereby defeated. Board of Public Instruction[s] of Polk County v. Board of Commissioners of Polk County, 58 Fla. 391, 50 So. 574 (1909).
"The amendment to Article VIII, § 5, did not specifically repeal any other section of the Constitution. Its terms are general. It deals only with county government. It has no relation at all to the special provision authorizing the Legislature to create a consolidated municipal government in Duval County. It is difficult to conceive that the Legislature or the people could have intended, merely by a small alteration of the powers and the terms of county commissioners, to wipe ont the entire constitutional section authorizing a consolidated municipal government in Duval County.
"Wilson v. Crews, (1948) [160 Fla. 169] 34 So.2d 114, cited by plaintiffs, does not hold to the contrary. In that case the later amendment not only involved the same subject matter but also the same section of the Constitution. There the court found in the later provision `an intent to revise the fundamental law governing the establishment of Justice Districts.'
"In some respects the question raised here is analogous to the question of whether a later general law repeals a prior special act. It is settled that a general act does not repeal or modify an existing special act unless the general act is a complete revision of the whole subject or unless the two acts are so irreconcilable as to clearly demonstrate a legislative intention to repeal. Sanders v. Howell, 73 Fla. 563, [74] 76 So. 802 (1917); Stewart v. DeLandLake Helen Special Road and Bridge District, (1916) 71 Fla. 158, 71 So. 42; [City of] Apalachicola v. State, (1927) 93 Fla. 921, 112 So. 618. By the same reasoning a later general provision of the Constitution does not impliedly repeal a prior one of special application unless the two provisions are utterly inconsistent and repugnant to each other.
"The two provisions under consideration here are entirely consistent and easily reconciled with one another. The Jacksonville Consolidation Amendment is not self-executing. Until it was implemented by legislative action, Duval County retained its county government and was governed by Article VIII, § 5, as that section existed both before and after 1944. The Jacksonville Consolidation Amendment is a special provision applying only to Duval County and giving the Legislature power at any time to consolidate the county and the cities within it into a municipality.
"Plaintiffs' original argument in favor of a contrary intent was based on the proviso at the end of the 1944 amendment. This proviso made it clear that the amendment did not affect Article VIII, § 11, which plaintiffs' complaint describes as `the Dade County Home Rule Charter Provision'. Plaintiffs say that the lack of a similar provision, saving the Jacksonville Consolidation Amendment, indicates an intention to repeal it. The fallacy of this argument is apparent from an examination of Article VIII, § 11, as it existed in 1944. While that section now provides for home rule in Dade County, it contained no such provision in 1944. At that time, it related solely to commissioners districts and the term of office of Dade County Commissioners. Thus, it dealt with exactly the same subject matter as Article VIII, § 5. Since the two sections had a common subject, a saving clause was needed when Section 5 was amended in 1944. Since the amendment to Article VIII, § 5, has no relation to the Jacksonville Consolidation section, no saving clause was required. The absence of a saving clause does not show an intention to repeal the Jacksonville Consolidation Amendment any more than any other unrelated section of the Constitution. It was not until 1956, some twelve years later, that the Dade County home rule provisions were incorporated into Article VIII, § 11.
*502 "I conclude, therefore, that the Jacksonville Consolidation Amendment was not repealed and that it was effective to authorize the Legislature to enact a charter in accordance with its terms."
The opinion of Judge Larkin then discusses in considerable detail the provisions of the Charter, the consolidation plan, and the powers and duties of the consolidated government. Since these are set out in toto in the statutes constituting the Charter, Sections 67-1320, 67-1535 and 67-1547, supra, we will omit the summary and quote only the conclusion:
"The manifest intention of the Legislature in enacting the Charter was to merge all of the former governments into a single consolidated government patterned after the recommendations of the Local Government Study Commission. The resulting government has broad home rule powers, including all of the powers and obligations of the County Commission and all of the powers and obligations of the former municipalities within its boundaries."
The Jacksonville Consolidation Amendment, Article VIII, § 9, containing the basic authority for the new form of government for the city and the county, is set out in full in the opinion. Since pertinent portions are repeated in the discussion of the validity of the Jacksonville Consolidation Charter enacted under the authority of the Consolidation Amendment, we will pretermit a quotation in full of the constitutional amendment and will proceed immediately to the discussion of the validity of the Charter enacted pursuant thereto.

"Constitutionality Presumed
"As we proceed to a discussion of the legal issues, one must remain aware that (1) we have constitutional authority granting the Legislature power to consolidate, (2) a Charter created and passed by the Legislature and (3) overwhelmingly approved by the voters. The Legislature has wide latitude in exercising its functions under the Constitution. Its determinations carry a presumption of validity, and they will not be set aside unless they are defective beyond all reasonable doubt. The Supreme Court made this clear in Gray v. Golden, (1956) 89 So.2d 785, a case very similar to this one where the court wrote:
"`Another thing we should keep in mind is that we are dealing with a constitutional democracy in which sovereignty resides in the people. It is their Constitution that we are construing. They have a right to change, abrogate or modify it in any manner they see fit so long as they keep within the confines of the Federal Constitution. The Legislature which approved and submitted the proposed amendment took the same oath to protect and defend the Constitution that we did and our first duty is to uphold their action if there is any reasonable theory under which it can be done. This is the first rule we are required to observe when considering acts of the Legislature, and it is even more impelling when considering a proposed constitutional amendment which goes to the people for their approval or disapproval. (Emphasis added).'

"Miscellaneous Constitutional Provisions
"Plaintiffs contend that the Charter violates various other provisions of the Constitution. These include Article III, § 16, by embracing more than one subject; Article III, § 20, by attempting in special legislation to regulate duties of a class of officers other than municipal officers; Article VIII, § 1, by attempting to abolish a county; and Article IX, § 16(c), and Article XII by transferring to the city duties of the county commissioners with respect to gasoline taxes and school funds.
"These contentions might well be persuasive if the Jacksonville Consolidation Amendment had been repealed, but since it is still in effect they have no merit.
*503 "Similar contentions were made by opponents of the Dade County Home Rule Amendment in Gray v. Golden, supra. In that case the plaintiffs contended that the amendment would have the effect of revising more than one article of the Constitution contrary to Article XVII, § 1. The Circuit Court sustained the objections but, on appeal, the Supreme Court reversed, pointing out that the proposed amendment dealt with a single subject matter, `home rule for Dade County', and that it was entirely proper for particular sections of the Constitution to limit others `in order to accomplish the specific purpose for which they were designed.'
"As is further stated by Justice Terrell in Gray v. Golden, supra:
"`We do not controvert the fact that when read in isolation provisions of the proposed amendment may appear conflicting and contradictory but when read in relation to other pertinent provisions, there is ample reason to dissolve the alleged conflicts.
"`* * *
"`Unity of purpose as revealed in the test; the details leading to it are not maobject sought by the amendment is the terial.'
"The determination and opinion of the Supreme Court in Gray v. Golden, supra, also disposes of the other alleged conflicts asserted by the plaintiffs not discussed specifically in this judgment.
"Inasmuch as the Jacksonville Consolidation Amendment specifically authorized the legislature to devise a charter creating a consolidated government, a charter enacted in accordance with that section does not violate any other general provisions of the Constitution, nor does the Charter amend or revise any general law dealing with the officers in Duval County which are abolished. Under the Charter the Consolidated Government is a county or a municipality for all purposes of general law. Therefore, it succeeds to Duval County's right to receive gasoline tax moneys and state school funds, and it has the same duties with respect to them as Duval County has.

"Beaches and Baldwin
"Plaintiffs contend that the Charter does not comply with the Jacksonville Consolidation Amendment because the urban services districts into which the municipalities of Jacksonville Beach, Neptune Beach, Atlantic Beach and Baldwin are converted are allowed to retain their former governments. Plaintiffs contend that this is improper because it creates four municipalities within a municipality. This contention is without merit.
"The Jacksonville Consolidation Amendment gives the Legislature power `to establish * * * a Municipal corporation to be known as the City of Jacksonville, extending territorially throughout the present limits of Duval County in place of any or all * * * municipal and local governments * * *'.
"In Wilson v. Crews, (1948) [160 Fla. 169] 34 So.2d 114, cited by plaintiffs for another point, the Supreme Court quoted an earlier case, saying:
"`It has been said that, as statutes are hastily and unskillfully drawn, they need construction to make them sensible, but Constitutions import the utmost discrimination in the use of language, that which the words declare is the meaning of the instrument.'
"The provision of the Jacksonville Consolidation Amendment quoted above clearly contemplates that the consolidated city government will extend throughout the territory, but that one or more municipal or local governments in the territory may continue in existence. Continuation of quasi municipal corporations appears to be well within the amendment.
"The Jacksonville Consolidation Amendment also authorizes the Legislature `to establish subordinate districts.' That is what the Legislature did in the Charter. It designated the areas which were formerly *504 within the municipalities of Jacksonville Beach, Neptune Beach, Atlantic Beach and Baldwin as urban services districts.
"The term `district' is not defined in the constitutional provision. It is susceptible of many meanings. Some of these are indicated in 27 C.J.S., Districts, p. 618:
"`The term "districts" is defined as meaning a division of territory made for administrative, electoral, or other purposes; a defined portion of a state, county, town, borough, or city for legislative, judicial, fiscal or election purposes; a special geographical area over which specific authority, executive, legislative, or judicial is exercised by properly constituted officers; * * *'.
"It is not unusual in Florida for districts to have governing bodies, the power to tax, the power of eminent domain and various other powers enjoyed by municipal corporations. Under the constitutional provision the Legislature had wide latitude in determining the characteristics of districts to be included in the consolidated government. Under the first sentence of the constitutional provision the retention of their former governments does not prevent them from being districts.
"It also appears that the districts are `subordinate'. The Consolidated Government has the power to tax and to enact ordinances operative throughout the county, to render services in those urban services districts, and to consolidate them subject to referendum by the voters. Under the circumstances, I conclude that the Legislature was authorized to permit the Beaches and Baldwin to retain their former governments subject to the controlling provisions of the Charter.

"Equal Protection of the Laws
"Plaintiffs contend that the Legislature violated the equal protection doctrine embodied in Section 1 of the Declaration of Rights of the Florida Constitution and in the 14th Amendment to the United States Constitution by (a) permitting the residents of the Beaches and Baldwin to retain their former governmental structures while denying this right to residents in Duval County and the old City of Jacksonville, and (b) permitting electors in the Beaches and Baldwin to vote for officers of the Consolidated Government.
"Needless to say, the Beaches and Baldwin are located in outlying areas of Duval County. The equal protection clause is not violated by reasonable classifications having a substantial relation to the purpose of the legislation. The Legislature could reasonably determine that the local problems in those urban services districts could be met more effectively if those districts were allowed to retain their former governments upon the terms specified in the Charter. No evidence has been adduced that the classification was arbitrary and capricious; consequently, it must be upheld.
"By the same token, the equal protection clause was not violated by permitting electors in those urban services districts to vote for officers of the Consolidated Government. The Consolidated Government is their government. It has the power to pass ordinances affecting them, to consolidate them (subject to referendum), to levy ad valorem taxes upon them for general services purposes. The only limitation upon its powers is that it may not levy ad valorem taxes for urban services. The cost of any urban services rendered by the Consolidated Government in those districts must come from other sources of revenue.
"Under the circumstances, the equal protection clause is not violated by permitting electors in the Beaches and Baldwin to vote for officers of the Consolidated Government. Indeed, they would be subject to taxation without representation and, thus, deprived of equal protection if this right were denied.

"Impairment of Contracts
"Plaintiffs contend that the Charter will impair the contracts and obligations *505 of the former governments in violation of the State Constitution. The answer to this contention is in the Charter itself. Under Section 1.01, the Consolidated Government becomes `subject to all of the liabilities, obligations and duties of the former governments from and after the effective date of this Charter'. Section 16.01 provides that all outstanding bonds issued by former governments `are obligations of the consolidated government; however, payment of such obligations and the interest thereon shall be made solely from and charged solely against funds derived from the same sources from which such payments have been made had this Charter not become effective.'
"The Charter does not affect either the rights or remedies of the creditors of the former governments. It does not impair the obligations of those former governments in any respect. Its provisions for creditors are substantially the same as those approved by the Supreme Court in State ex rel. Johnson v. Goodgame, [91 Fla. 871] 108 So. 836 (Fla. 1926). Consequently, plaintiffs' contentions have no merit.

"Rural Lands Included in Municipality
"Plaintiffs contend that the Charter is invalid because the municipal corporation extending throughout the county includes rural lands. The answer to this is found in the third section of the Jacksonville Consolidation Amendment which permits the Legislature to determine what portion of the municipality is a rural area for homestead purposes. Certainly, it would be improper to tax rural property for services which do not benefit the rural areas. State ex rel. Landis v. [Town of] Boynton Beach, 129 Fla. 528, 177 So. 327 (1937). That is the apparent reason for the determination of the Legislature to divide the county into a general services district and several urban services districts. Under the scheme of the Charter, as contemplated by the Jacksonville Consolidation Amendment, the county is classified for tax purposes in accordance with the services actually rendered by the city to each particular area, and the taxpayers in each area bear the cost of only those services which are furnished to them. If the Legislature had not classified the areas of the city into districts, plaintiffs' contention might have merit. It is not persuasive in the context of the Consolidation Amendment and the present Charter.

"Apportionment of Council Districts
"Plaintiffs contend that the council districts are unfairly apportioned and that the Charter as a whole is therefore invalid. The boundaries of the council districts are contained in the Charter. They were drawn by the Legislature from 1966-1967 population estimates made by the Jacksonville-Duval Area Planning Board. The estimates were made according to generally accepted techniques used in making estimates of population, and there is no evidence that they were not substantially correct. No other evidence has been offered of the present population of the council districts.
"Plaintiffs based their contention of malapportionment on the Legislature's use of current population estimates instead of the population figures shown in the 1960 decennial census. Plaintiffs contend that use of the last decennial federal census was required by Article VII, § 5, of the Constitution and § 11.031, Florida Statutes. The constitutional provision cited by plaintiffs eliminated a former provision of the Constitution which required the state to make a decennial census. The new provision provides that the Legislature is no longer required to do this and that the last preceding federal census shall be the state census and `shall control in all population acts and constitutional apportionments, unless otherwise ordered by the legislature.' Section 11.031, Florida Statutes, provides that no `special city, county or district census shall be effective for any purpose * * *'.
*506 "In their attack on the charter plaintiffs contend that the use of current population estimates was a violation by the Legislature of these provisions. If plaintiffs' contention were accepted the effect would be to hold a legislative act invalid because the legislature did not conform to a prior act which the Legislature itself had passed in a case where the only constitutional provision invoked expressly gives discretion to the Legislature. The constitutional provision and the statute are both intended to provide a means for determining definitely when various population acts apply. They also govern when reapportionment is needed under Article VII of the Constitution or when county commissioners reapportion their districts under Article VIII, § 5. Needless, to say, the Legislature is authorized under Article VII, § 5 to use population figures other than the last federal census if in its judgment current figures would create a more equal apportionment.
"The propriety of the Legislature's use of current figures was demonstrated at the hearing. There have been substantial shifts of population in Duval County since 1960. If the 1960 census figures were applied to the council districts as drawn by the Legislature, the variation would be as high as 24% above the average and as low as 36% below the average. Using current figures the maximum variation is only 11.82%, well within the federal guidelines. Toombs v. Fortson, 241 F. Supp. 65, U.S.D.C.N.D. Ga.: 1965, affirmed without opinion, 384 U.S. 210, 86 S.Ct. 1464, 16 L.Ed.2d 482; Swann v. Adams, 263 F. Supp. 225, U.S.D.C., S.D. Fla.: 1967.
"If plaintiffs' contention were accepted and reapportionment were ordered on the basis of the 1960 census figures, this Court would be in the incongruous position of not only setting aside an act of the Legislature which was authorized by the constitutional provision involved but also ordering a reapportionment which would violate the federal Constitution as interpreted in recent Supreme Court cases. Plaintiffs cite Swann v. Adams, 263 F. Supp. 225 (1967), a reapportionment case in which a three-judge court accepted 1960 census figures as meeting the minimal federal requirements in the absence of more reliable population data. Needless to say, there is a vast difference between (a) using 1960 census figures in a reapportionment case to draw new district lines when those figures are the best available and (b) using 1960 census figures to attack an apportionment made by the Legislature from reliable current population estimates, especially in a case where substantial population shifts have occurred since 1960.
"Since the only current figures now available are those used by the Legislature, no purpose would be served in ordering reapportionment or striking down the Charter. In any event, reapportionment will automatically occur under Section 5.02 of the Charter as soon as the 1970 Federal census figures become available. I conclude that plaintiffs' attack on the apportionment of council districts has no merit."
The plaintiffs made a separate attack on those portions of the Charter contained in the two amendatory Acts, Ch. 67-1535 and 67-1547, adopted by the Legislature within a few days after the adoption of the original Charter, Ch. 67-1320. The basis of this attack is that the amendments contained in these Acts were not enacted in accordance with the requirements of Article III, Section 16, Florida Constitution, that, when amended, "the act as revised or section, or subsection of a section, or paragraph of a subsection of a section, as amended, shall be reenacted and published at length." The plaintiffs relied on the decisions of this court in Lipe v. City of Miami, 141 So.2d 738 (Fla. 1962) and Auto Owners Insurance Co. v. Hillsborough County Aviation Authority, 153 So.2d 722 (Fla. 1963) in support of their contention in this respect. This contention was disposed of by the trial judge as follows:
"The Lipe case involved the validity of an amendment to the charter of the City of Miami relating to the civil service *507 system. The amendment added a new subparagraph (c) to an existing section. Without any introduction, the subparagraph listed certain job titles. The parent section of the original act began with language making it clear the jobs listed in the section were `unclassified'. Although it could not be determined from the language of the amendment, the effect of the amendment was to categorize the positions listed in the new subparagraph (c) as unclassified jobs in which civil service rights did not accrue. The effect of the amendment on the civil service rights of the employees in the listed jobs could not be determined from the amendment itself. The court held that the test of compliance with Article II [III], § 16, was whether the amendment is intelligible in itself without `reference' to the act it purports to amend.
"In the Auto Owners case suit was brought on a contractor's bond given pursuant to Chapter 255, Florida Statutes. The defendant relied upon a one-year statute of limitations contained in an amendment which added a second subsection to Section 255.05. The subsection which was added required persons supplying labor or material to give notice to the contractor within 90 days after performance of the work or delivery of the materials. The section had not previously contained any statute of limitations. The new section also contained a one year statute of limitations on `the surety bond required in this section'. The provision requiring the surety bond and specifying its purpose was in the first subsection of the section which was not republished in the amendment. Under the circumstances the amendment referring to the bond made no sense without republication of the entire section. The court followed the Lipe case and held that the amendment violated Article III, § 16.
"Under these cases when is the constitutional provision violated? In Lipe the court took care to point out that it should overthrow only such acts `as clearly offend the spirit and meaning of the Constitution.' (Emphasis added). It further observed:
"`We further feel constrained to point out to all concerned that the language used here to describe the contemplated evils by the last portion of Section 16, Article III * * * should be strictly limited to the facts of this case, keeping ever in mind that each succeeding case must of necessity stand or fall upon the language of the statutory revision or amendment involved. If the statutory enactment is complete and intelligible in itself without reference to the act it purports to amend, Article III, § 16, of the Constitution of the State of Florida is satisfied.'
"The two cases do not say how much `reference' is required to the original statute for a violation of Article III, § 16 to exist. The explicit terms of the constitutional provision contemplate that in a proper case reenactment of a single paragraph of a sub-section is sufficient. Speaking literally, no paragraph, section or group of sections has meaning without some reference to the act which is being amended. If the constitutional provision were construed to require republication whenever any reference is required it would be unworkable. Every act would have to be re-stated in its entirety for an amendment to be effective. Needless to say, this is not necessary. The draftsman of an act may assume that members of the Legislature are acquainted with the general purpose of the original act, with its over-all framework, with the manner in which the section fits into that framework, and with the meaning of any defined terms in the legislation.
"The facts in Lipe and Auto Owners demonstrate what is meant by `reference' and provide a guide for deciding when more than the actual amended language must be republished to comply with the constitutional mandate. In both of those cases the effect of the amended section itself could not be understood without reference *508 to the original act. Under the circumstances, I conclude that when a section, sub-section or paragraph is amended enough of the act being amended must be republished to make the meaning of the provision published intelligible from its language and to insure that no unexpected meaning results from the combination of that language and other language in the Act.
"The Webster case [Webster v. North Orange Memorial Hospital Tax District, 1966, 187 So.2d 37] which was a bond validation case confirms this reasoning. Chapter 59-1657 had created a special hospital district in Orange County. The chapter was a comprehensive act establishing the district, describing the territory covered by it, creating a Board of Trustees, enumerating their powers and giving them the power to operate hospitals, borrow money and issue bonds. Section 8 of the Act provided for a referendum election to authorize the issuance of bonds to construct a hospital. These were to be general obligations of the district. The bonds were not issued and no hospital was constucted. Later, Chapter 63-1701 was passed. It amended only Section 7 of the original Act, which had authorized the trustees to borrow $20,000.00 and to issue `notes'. The single section of Chapter 63-1701 amended Section 7 to authorize the issuance of revenue bonds. At the next session of the Legislature Chapter 65-2003 was passed. It purported to amend Chapter 63-1701, although its actual effect was to amend Section 7 of the original Chapter, 59-1657. The original Chapter was not mentioned in the amending Act. A single section was republished to amend the terms of the bonds which the trustees were authorized to issue. The Section described the trustees only as `the Board of Trustees'. The name of the taxing district did not appear in the bill. The only reference to it was in the title of the Act. The latest amendment was attacked on the ground that it violated Article III, Section 16 of the Constitution since it was not intelligible without reference to the original act. The Supreme Court rejected the contention using the following language and citing Lipe and Auto Owners as authority:
"`As to Chapter 65-2019, amended by reference to title only, or without republication of the basic Act, this Statute we find to be complete, coherent, and intelligible when read in isolation so that it is not necessary to refer to the books in order to relate it to the Chapter amended or Chapter 59-1657.'
"An examination of the various amendments to the charter in light of this test case makes it clear that most of them stand on their own feet. They are intelligible by themselves without more than a knowledge of the general purpose and framework of the charter. This is demonstrated by an examination of each amendment individually."
The opinion then discusses in detail each separate amendment and concludes that most of them could not possibly be susceptible to attack under Article III, Section 16, supra. We are, however, particularly impressed with Judge Larkin's conclusion that the circumstances in which the amendments were adopted were different from those in the cases cited. As stated by Judge Larkin:
"* * * Chapters 67-1535 and 67-1547, the two amendments of the original Act which are under attack in this proceeding were passed at the same session of the Legislature within nineteen days after passage of the basic Charter. The latest of the two amendments, Chapter 67-1547, was introduced in the Senate only 14 days after the basic charter had been sent to the Governor for signature. All three acts resulted in one charter and were the culmination of a single continuing process of legislation. Under these circumstances it is highly unlikely that the members of the Legislature were confused. The dangers which the constitutional provision was intended to protect against did not exist. Even if some amendments did not meet the test, justification may well exist under the particular *509 circumstances for a more liberal application of Article III, Section 16. * * *"
We are in complete agreement with the logic of this argument and think that it is conclusive of the validity of the amendments as against the attack under Article III, Section 16, in the case presented here. This being so, we think it is unnecessary to do more than advert briefly to two other points made by Judge Larkin, namely, (1) that the plaintiffs are not directly affected by the amendments in question and therefore have no standing to attack them, and (2) the amendatory provisions could be deleted without striking down the entire Charter. Ample authority in support of these statements is cited.
Plaintiffs also attacked the validity of the referendum in which the Charter was adopted by the voters. Their contention in this respect, and his disposition thereof, are well stated by Judge Larkin as follows:
"Plaintiffs contend that the notice was defective because the Legislature amended the charter before the referendum without giving any additional notice and because the last amending act, although it had been passed some four weeks before the referendum, did not become effective until August 4, 1967, four days before the referendum and after the ballots had been published as required by law. These circumstances do not affect the validity of the referendum. All the acts had been passed and their provisions were widely publicized well before the referendum. Notice required by the charter was published and the fact that one of the acts did not technically become law until very shortly before the election was immaterial.
"This situation is analogous to the one in Willets v. North Bay Village, 60 So.2d 922, (Fla. 1952). In that case a referendum to approve a new charter was called at a meeting of the city council attended by less than a quorum. The council's action was clearly defective. Nevertheless the charter approved at the referendum was upheld. The Court said:
"`It is perfectly clear that the notice given served all the purposes of a legal one. Whether it was a directory or a mandatory prerequisite to a legal election, we do not have to decide. The rule seems approved on good authority that whether mandatory or directory, informalities or irregularities which do not affect the result of an election, will not render it invalid. This is all the more true as to the expression of the popular will when that is satisfied.
"`It is quite true that the election call, having been made by two councilmen, was not regular, but since the people got the notice and went to the polls and voted, it served the same purpose as if it had been regular.'
"This case is even stronger. In North Bay Village the call never had any validity. Here the amending act having been passed and publicized four weeks before the election finally did become law. Thus the kind of defect that existed in North Bay Village is not present in this case.
"The legal requirements of a referendum election were prescribed in Hill v. Milander, 72 So.2d 796 (Fla. 1954). In that case, the issue was whether the question on the ballot adequately informed the electors of the proposition on which they were voting. The Court upheld the description on the ballot and said:
"`In numerous instances we have held that the only requirements in an election of this kind are that the voter should not be misled and that he have an opportunity to know and be on notice as to the proposition on which he is to cast his vote. * * *
"`All that the Constitution requires or that the law compels or ought to compel is that the voter have notice of that which he must decide.'
"I conclude that these requirements are met in this case by the publication of the *510 notice as required by the Legislature and the wide publicity given the Charter, including the amendments, prior to the referendum election."
The other contentions made by plaintiffs respecting the invalidity of the charter, or various provisions thereof, have been carefully considered. We find that they are devoid of merit and that no useful purpose would be served in further extending this lengthy opinion by a discussion thereof.
For the reasons stated, the opinion here reviewed should be and is hereby
Affirmed.
ERVIN, C.J., DREW, CARLTON, ADKINS and BOYD, JJ., and TAYLOR, Circuit Judge, concur.