[No. 43139.  En Banc.  October 17, 1974.]

THE PORT OF LONGVIEW, *Respondent*, v. THE TAXPAYERS OF THE PORT OF LONGVIEW *et al*, *Appellants*.

THE PORT OF TACOMA, *Respondent*, v. THE TAXPAYERS OF THE PORT OF TACOMA *et al*, *Appellants*.

THE COUNTY OF SPOKANE, *Respondent*, v. THE TAXPAYERS OF THE COUNTY OF SPOKANE *et al*, *Appellants*.

*Klingberg, Houston, Reitsch, Cross & Frey,* by *Judson Klingberg* and *William J. Kenny,* for appellants Taxpayers of the Port of Longview.

*Hutchins, Plumb & Wheeler,* by *R. G. Hutchins,* for appellants Taxpayers of the Port of Tacoma.

*Trezona, Lorenz, Parry & Esposito,* by *Will Lorenz,* for appellants Taxpayers of Spokane County.

*Larry Carter* and *David L. Beller* (of *Preston, Thorgrimson, Ellis, Holman & Fletcher*), for respondents.

UTTER, J.—This is an appeal of three consolidated cases. Plaintiffs, Port of Longview, Port of Tacoma, and Spokane County, brought declaratory judgment actions in the trial court under RCW 7.25 against the taxpayers of the Port of Longview, Port of Tacoma, and Spokane County

respectively,[1] to establish the constitutionality of Laws of 1973, ch. 132, and Laws of 1972, 1st Ex. Sess., ch. 54. The two legislative acts were found constitutional, and defendant taxpayers appealed to this court. We hold parts of both of these legislative acts to be a violation of Const. art. 8, § 7 and reverse the trial court.

The Weyerhaeuser Company has been required to install pollution control facilities at its Longview plant by July 1, 1975, and the Kaiser Aluminum & Chemical Corporation, similarly, at its Tacoma and Spokane County plants by September 1, 1974, and October 31, 1974, respectively. This is a result of pollution control legislation now codified in RCW 70.94 and 90.48, regulations promulgated under these laws, and administrative action taken by the Department of Ecology.

Public Law 90-364 added in 1968 a new subsection (c) to the Internal Revenue Code, 26 U.S.C. § 103. This provides, generally speaking, that for federal income tax purposes gross income does not include interest on the obligations of a state or political subdivision of a state issued to provide for air or water pollution control facilities. It applies where the facilities are used directly or indirectly in any trade or business carried on by an organization not a governmental unit.

In 1972 our state legislature enacted the challenged legislation which sought to allow port districts to make available pollution control facilities to nonpublic entities. The act allowed this to be done by lease, lease purchase agreement, or other agreement binding such user to pay for the use of said facilities for the full term of the revenue bonds issued by the port for the acquisition of said facilities. The payments were to at least fully reimburse the port for all

---

[1]Other nominal defendants in this consolidated case included the Weyerhaeuser Company, a Washington corporation, in the Port of Longview suit, and Kaiser Aluminum & Chemical Corporation, a Delaware corporation, in each of the two other suits. Neither of these two nominal parties actively participated in the litigation at trial or in this appeal.

principal and interest paid by it on the bonds. Laws of 1972, 1st Ex. Sess., ch. 54, § 1, p. 124.

The Weyerhaeuser Company requested from the Port of Longview assistance in financing the cost of the acquisition, construction, and installation of the pollution control facilities necessary to be installed at the Longview complex. The Port, acting pursuant to Laws of 1972, 1st Ex. Sess., ch. 54, entered into a pollution control facility financing agreement in which it agreed to purchase a leasehold interest in certain land and pollution control facilities to be owned by Weyerhaeuser and installed at the Weyerhaeuser Longview complex. It further agreed to make such facilities available to Weyerhaeuser by sublease.

In March 1973, the Port of Tacoma and Spokane County each entered into separate agreements with the Kaiser Corporation. Each of these municipal corporations agreed to assist Kaiser in the financing of the acquisition, construction, and installation of pollution control facilities at its plants in their respective jurisdictions. They acted under the Laws of 1973, ch. 132, § 4, p. 375.[2]

---

[2]Laws of 1973, ch. 132, § 4, p. 375:

"NEW SECTION. Sec. 4. In addition to any other powers which it may now have, each municipality shall have the following powers:

"(1) To acquire, whether by construction, purchase, devise, gift or lease, or any one or more of such methods, one or more facilities which shall be located within, or partially within the municipality;

"(2) To lease, lease with option to purchase, sell or sell by installment sale, any or all of the facilities upon such terms and conditions as the governing body may deem advisable but which shall at least fully reimburse the municipality for all debt service on any bonds issued to finance the facilities and for all costs incurred by the municipality in financing and operating the facilities and as shall not conflict with the provisions of this chapter;

"(3) To issue revenue bonds for the purpose of defraying the cost of acquiring or improving any facility or facilities or refunding any bonds issued for such purpose and to secure the payment of such bonds as provided in this chapter. Revenue bonds may be issued in one or more series or issues where deemed advisable, and each such series or issue may have the same or different maturity dates, interest rates, priorities on revenues available for payment of such bonds and priorities on security available for assuring payment thereof, and such other differing terms and conditions as are deemed necessary and are not in conflict with the provisions of this chapter."

A subsequent agreement between Weyerhaeuser and the Port of Longview provided that their 1972 pollution control facility financing contract would be binding on each of them according to the terms of the Laws of 1973, ch. 132 and not Laws of 1972, 1st Ex. Sess., ch. 54, unless the 1973 act was held to be unconstitutional. In the event of the act's unconstitutionality, the parties agreed to deem themselves bound by the terms of the 1972 act.

The form of the three pollution control facility financing agreements entered into between the private corporations and the political subdivisions of this state in this suit are the same in all important details. They provide in substance that the port district or county shall issue bonds in the name of the municipality sufficient to cover the cost of acquisition, construction, and installation of the pollution control facility on property of the private corporation. Under the terms of the agreement, the municipalities have agreed to purchase a leasehold interest in the pollution control facility with the proceeds from its bond issue and to transfer to the corporation a lump-sum payment from the funds for the leasehold. This lump-sum payment equals in amount that sum necessary from time to time for acquisition, construction, and installation of that facility. The private corporation, in turn, receives payment from the municipality for this leasehold and uses those funds to acquire the completed pollution control facility.

Simultaneous with the lease to the municipality, the municipality has subleased back to the private corporation its entire possessory interest in the facility for a term equal to the original leasehold term, less 1 day. The acquisition cost to the private corporation for the sublease is equal to the municipality's cost, principal plus interest in retiring the bonds, plus any incidental municipal administration costs. However, unlike the lump-sum payment made by the municipality for the original lease, the owner-lessor-sublessee of the pollution control facility, the private corporation, has agreed to pay for the sublease with periodic payments over the entire term of the sublease. At the conclusion of the

simultaneous lease-sublease term, the reversionary interest of the private corporate owner of the pollution control facility becomes a present interest fully vested both in interest and possession with no additional payment to the municipal corporation.

The bonds are issued in the name of the municipality. The face of the bond declares that it is an obligation of the issuing municipality. The proceeds from the issue of the bonds are received in the municipal treasury out of which they are paid to the private corporate owner of the facility. These bonds differ, however, from general obligation bonds and the usual municipal revenue bonds in that they provide to the issuing municipality a contractual affirmative defense to a suit by a bondholder for the municipality's breach of obligation on the bond. Specifically, the terms of the bonds provide that, in the event the owner-lessor-sublessee private corporation defaults on its sublease obligation to the municipal corporation in whose name the bonds are issued, the bondholder shall hold harmless the municipality and may proceed only against the private corporate owner and sublessee of the facilities and the specific assets acquired by the private corporation with the bond proceeds.

In these cases respondents port districts and Spokane County have authorized the issuance of $67,000,000 to finance the private acquisition of pollution control facilities. Some $40,000,000 in municipal bonds have already issued and are now held by a commercial bank. Counsel for respondents has informed this court in oral argument that "there are several hundred million dollars more [in privately owned pollution control facilities] that will be dependent upon the outcome of this case."

Appellants, taxpayers of the Port of Tacoma, Port of Longview, and Spokane County, argue that the lease-sublease transactions between these municipal corporations and private corporations are nothing other than a municipal loan of money to a private corporation in direct violation of Const. art. 8, § 7, which provides:

> No county, city, town or other municipal corporation shall hereafter . . . loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm . . .

They contend that, stripped of all its lease-sublease terminology, the municipality is simply borrowing money in its own name in the form of a municipal bond issue and loaning that same money to a private corporation. The private corporation, in turn, has agreed to repay the principal and accrued interest on the money borrowed originally by the local government.

We agree with appellants that the agreements entered into between the municipal corporations and private corporations here are indistinguishable in function and operative effect from a loan of money with repayment of principal plus interest over a term.

The money which is raised by the municipal bond issues and which ultimately is used by the private corporations to acquire, construct, and install their pollution control facilities is the municipality's money. The bonds were issued by the municipal corporation, and the proceeds from their sale came into the municipal treasury. While these bonds are payable out of the private corporation's sublease payments to the local governmental unit, which is a specific source, they are nonetheless obligations of that local government. This is apparent from the opening paragraph on the face of the bond. In the Port of Longview case, the opening paragraph of the bond states:

> The Port of Longview, Washington, a municipal corporation organized and existing under the laws of the State of Washington (hereinafter called the "Port"), acknowledges itself indebted and for value received promises to pay to Carr & Co. or its successor, or its registered assigns the principal sum of
> TWENTY MILLION DOLLARS ($20,000,000)

The private corporate owners and sublessees of their own facilities rely upon the fact that these funds are municipal funds derived from the issuance of municipal bonds and

that the bonds are, therefore, accorded tax-exempt status under the federal income tax law. Their sublease agreements specifically provide that they, in their discretion, may terminate the sublease if their bond counsel conclude that the interest on the bonds is taxable.

The transactions entered into here are loans and not tandem lease-sublease agreements. The 1973 act itself recognizes that the true nature of the transaction is a loan by providing in Section 6(1) that the principal and interest on any bond shall be secured by a pledge of the lease payments, or by a mortgage, or by a trust agreement or any other security device. At the trial, respondents' own expert witness, a vice-president of a large investment bank and an expert in municipal securities, testified that in his professional judgment the transactions at issue in this case were loans. When asked "do you know why they [the municipalities and private corporations] go through this business of a lease and a sublease," he replied "[y]es, I do. It relates to, usually to either real or imagined constitutional problems, that is state constitutional problems, with devising the transaction in any other fashion." At oral argument, respondents' counsel, when questioned on the proper characterization of the transaction, first called it a lease and then candidly stated, "It's a financing arrangement is the generic term which should be applied. Specifically, it has the form of a lease instead of a mortgage for reasons which are peculiar to the advantages of a lease instead of a mortgage as a financing arrangement."

A true lease agreement contemplates the purchase by the lessee of a possessory estate for a term in specified real or personal property. A financing agreement, on the other hand, contemplates the loan of money to another, often secured by a security interest in the property to be purchased with the loaned money, to enable the latter to acquire an interest in the property. The two roles, that of sublessor and financier, are entirely different. 1 G. Gilmore, *Security Interests in Personal Property* § 3.6 (1965).

In the Port of Tacoma case, nominal defendant-appellant

Kaiser Aluminum & Chemical Corporation requested and received a private revenue ruling from the Internal Revenue Service "that the $13,800,000, if received as a result of the sale of the Port of Tacoma interim bond, will not be treated as rental income . . ." In the Internal Revenue Service's opinion, the municipality's payment of $13,800,000 to Kaiser, characterized by the parties as a purchase of a leasehold interest by the Port of Tacoma in the pollution control facilities, is, lease-sublease terminology notwithstanding, a loan by the municipality to Kaiser. Under their rationale, Kaiser need not declare, for federal income tax purposes, its receipt of that sum as rental income. Kaiser intends to deduct from its federal income tax the accrued interest portion of the municipal bond retirement payment which it remits to the Port of Tacoma as payments characterized as sublease payments and not the entire "sublease" payments as it would be entitled to do if the transaction involved a true sublease. This is consistent with the Internal Revenue Service's treatment of the transaction as a loan and not a lease.

In all of the sublease agreements it is expressly provided that the private corporation may cancel the sublease if the Internal Revenue Service rules that the payment by the municipality for the underlying leasehold constitutes gross income to the private corporation. In every case the private corporation sought to persuade the Internal Revenue Service to view the transaction as a loan of money while at the same time arguing in our state courts that these transactions should be considered to be leases. This inconsistent treatment was apparently deemed necessary to save them from attack as violating our state constitutional prohibition against the municipal loan of money to a private corporation. Const. art. 8, § 7.

These transactions cannot be both loans and lease-sublease agreements. Viewed as a whole, they make clear that (1) the municipalities involved had no intention of asserting a possessory interest in the leased facilities as, indeed, the simultaneous sublease would have effectively

prevented in any case; (2) the municipalities received nothing of value by virtue of these transactions to which they were not already by law entitled; and (3) the pollution control facilities acquired by the private corporations and constructed on their property could only be used at their individual and respective plants and could be of no separate value to the municipality. The fact that the sublease terms were drafted to expire 1 day short of the expiration of the underlying leasehold, thereby giving the municipality, technically speaking, the legal right to 1 day of exclusive possession of the pollution control facilities, merely continues the *form* of the transaction.

These transactions are patent, albeit convoluted, violations of Const. art. 8, § 7. The Laws of 1972, 1st Ex. Sess., ch. 54, § 1 and Laws of 1973, ch. 132, § 4, pursuant to which these transactions were entered into, are unconstitutional.

This is consistent with our recent holding in *State ex rel. O'Connell v. PUD 1*, 79 Wn.2d 237, 484 P.2d 393 (1971). There the PUD took assignments of the seller's interests in conditional sales for electrical equipment to PUD customers. We held that this practice was a violation of Const. art. 8, § 7. There we said at page 241:

> The transaction in question is clearly a loan of the money of the respondent district. Respondent *presently* pays out money in exchange for the right to receive *future* repayment, together with interest. This court said in *Hafer v. Spaeth*, 22 Wn.2d 378, 384, 156 P.2d 408 (1945):
>
>> The word "loan" imports an advancement of money or other personal property to a person, under a contract or stipulation, express or implied, whereby the person to whom the advancement is made binds himself to repay it at some future time, together with such other sum as may be agreed upon for the use of the money or thing advanced. *State v. Larson*, 119 Wash. 259, 205 Pac. 373; *Embola v. Tuppela*, 127 Wash. 285, 220 Pac. 789; *First Bank of Cordova v. Tjosevig*, 138 Wash. 231, 244 Pac. 736; . . .

We decline to hold that the municipality's right to possession of the pollution control facilities upon the default

of the private corporation on its sublease makes these transactions lease agreements. The municipality's right to possession of these facilities upon default of the private corporation is fully consistent with the view that these transactions are loans of money secured by a security interest in the facilities acquired with the loaned funds. Furthermore, the bonds provide that upon the private corporation's sublease default, the municipal bondholder, and not the municipality, has first priority in the pollution control facilities.

The majority of state supreme courts that have considered similar pollution control facility financing plans have found them valid under their state constitutions. *North Carolina State Ports Authority v. First-Citizens Bank & Trust Co.,* 242 N.C. 416, 88 S.E.2d 109 (1955); *Green v. Mount Pleasant,* 256 Iowa 1184, 131 N.W.2d 5 (1964); *State ex rel. County Court v. Demus,* 148 W. Va. 398, 135 S.E.2d 352 (1964); *Gaylord v. Gaylord City Clerk,* 378 Mich. 273, 144 N.W.2d 460 (1966); *Uhls v. State ex rel. Cheyenne,* 429 P.2d 74 (Wyo. 1967); *Ginsberg v. Denver,* 164 Colo. 572, 436 P.2d 685 (1968); *Carruthers v. Port of Astoria,* 249 Ore. 329, 438 P.2d 725 (1968); *Allen v. Tooele County,* 21 Utah 2d 383, 445 P.2d 994 (1968); *People ex rel. Salem v. McMackin,* 53 Ill. 2d 347, 291 N.E.2d 807 (1972); *State ex rel. Brennan v. Bowman,* 89 Nev. 330, 512 P.2d 1321 (1973). However, because of distinguishing facts or lack of persuasive reasoning, we decline to follow those cases.

■■■■ We find the reasoning of the Nebraska Supreme Court convincing. In *State ex rel. Beck v. York,* 164 Neb. 223, 82 N.W.2d 269 (1957), the Attorney General of Nebraska sought to enjoin the City and its officials from proceeding with an agreement under which the City would purchase certain industrial buildings to be constructed by the York Cold Storage Company and then leased back to the York Packing Company. The purchase of the building was to be financed by revenue bonds pursuant to certain state statutes. Article 13, section 3 of the Nebraska State Constitution provides:

The credit of the state shall never be given or loaned in aid of any individual, association, or corporation.

The Nebraska Supreme Court held that the revenue bonds, although not a general liability of the City, did burden the City, and, therefore, were an unconstitutional loan of money or credit. The court said, at pages 227, 229-30:

It seems clear to us that the revenue bonds are issued by the city in its own name to give them a marketability and value which they would otherwise not possess. If their issuance by the city is an inducement to industry, some benefits must be conferred, or it would be no inducement at all. Such benefits, whatever form they may take, necessarily must be based on the credit of the city. The loan of its name by a city to bring about a benefit to a private project, even though general liability does not exist, is nothing short of a loan of its credit. . . .

. . . .

. . . It is not material what such undertakings may be called, or what forms are devised to conceal their main purpose, or how worthwhile they may appear to be, when the question of constitutionality is presented, their substance will be examined. The financing of private enterprises with public funds is foreign to the fundamental concepts of our constitutional system. To permit such encroachments upon the prohibitions of the Constitution would bring about, as experience and history have demonstrated, the ultimate destruction of the private enterprise system.

We agree with the Nebraska Supreme Court. Cases similar in reasoning and result are *Moyie Springs v. Aurora Mfg. Co.,* 82 Idaho 337, 353 P.2d 767 (1960), and *State ex rel. Saxbe v. Brand,* 176 Ohio 44, 197 N.E.2d 328 (1964).

The result of the state's participation in this form of financing cannot be said to have no impact on the state's ability to finance its other governmental obligations. To the extent that these transactions affect the state's ability to carry out its other functions, it is a loan of the state's credit in a very real sense.

The purpose sought to be served by the congressional exemption of interest on obligations of a state or political subdivision from the computation of gross income for fed-

eral income tax purposes is to permit state and local governments to obtain capital at a low rate of interest. *See Fox v. United States,* 397 F.2d 119 (8th Cir. 1968). This exemption from federal income tax of the interest on state and local obligations has remained a prominent feature of our income tax despite early and widespread understanding of its inherent tax inequities. *See, e.g.,* L. Fitch, *Taxing Municipal Bond Income* (1950); D. Ott & A. Meltzer, *Federal Tax Treatment of State and Local Securities* (1963).

In 1969 the House Ways and Means Committee recognized and articulated the exemption's inequitable effects on the tax system and its inefficiency in furnishing to state and local governments the financial assistance hoped for in this federal income tax exemption. The Committee reported:

> Capital outlays of State and local governments for such projects as schools and other public buildings, highways, water and sewage systems, and antipollution facilities have doubled during the past decade. In order to market an increasing volume of securities to finance these public projects in competition with a growing volume of private borrowings, State and local governments have been offering higher yields, and the differential between tax-exempt and taxable securities of comparable quality has been narrowing. Historically, the ratio of yields on tax-exempt issues to taxable issues has been as low as 60 percent, but in recent years it has been close to 75 percent.
>
> The ratio of yields has varied in response to the general availability of credit, the demand for credit and the proportionate demand by State and local governments to the total market demand for credit. As a result, high income individuals and institutions otherwise subject to high tax rates who constitute a major portion of the market for tax-exempt State and local securities have been receiving significantly larger tax benefits than needed to bring them into the market. Recent estimates place the annual saving in interest charges to State and local governments at $1.3 billion, but the annual revenue loss to the Federal Government has been estimated at $1.8 billion.

H.R. Rep. No. 413, 91st Cong., 1st Sess. 172-73 (1969).

As the need of state and local governments for capital funds inevitably increases, higher tax-exempt municipal bond premiums must be offered in order to find a sufficiently large municipal bond purchasing market adequate to finance such state and local needs as construction and maintenance of schools, water and sewage systems, rapid transit, and the like. Respondents' municipal securities expert testified that "those who generally buy these securities are in a high tax bracket. However, in order to induce the investor at margin, as more and more municipal securities are issued . . . you have to bring in people who are in lower tax brackets. . . . you have to make the after-tax equivalent as to them attractive in their lower [marginal] rate, let's say 25 percent."

The need to increase premiums on government obligations necessarily increases governmental operating costs and frustrates the purpose of the exemption from federal income taxation of interest earned on government-issued obligations. By giving private corporations access to the lower premium municipal bond market to finance their purchase of pollution control facilities, local governments thereby reduce availability of municipal bond purchases necessary to finance needed public projects. This reduction in the availability of bond purchasers may then be eradicated only by increasing the bond premium, thereby increasing the size of the class of investors to whom municipal bonds are attractive investments. Only recently, in an unprecedented action, the City of New York voided a bond issue needed to finance construction of schools, water supplies, and rapid transit because the lowest average bond premium which could attract a purchaser, 7.923 percent, the highest in the City's municipal bond history, was too costly for the City to bear.[3]

---

[3]The Wall Street Journal, *More Companies Sell Tax-Exempt Bonds for Pollution Control, Saving Millions,* July 8, 1974, at 20, col. 1.

The New York Times, *Climbing Interest Rates,* July 10, 1974, at 47, col. 6, and 53, col. 1.

Alternatively to their lease-sublease constitutional justification for the transactions here questioned, respondents argue that the transaction, however it may be characterized correctly, is not a municipal loan of money or credit to a private corporation in violation of Const. art. 8, § 7. This is said to be so because the ultimate source of the funds is a commercial bank and the credit which the bank-bond purchaser relies upon is not that of the issuing municipality. but that of the ultimate borrower, the private corporation. Therefore, our constitutional prohibitions against the public loan of money or credit to private corporations are not violated. The municipality, respondents' municipal securities expert testified, is a mere conduit through which the loan and its subsequent repayment flow. Respondents argue that the municipalities assume no liability as a result of these transactions although Washington industry is greatly aided. The argument is made that local government is not harmed by these transactions, private enterprise receives an economic advantage because of a subsidy from the federal purse, and ultimately local governments are actually aided by virtue of an increased *ad valorem* tax base and increased local payroll through increased local employment.

It cannot be doubted that the private corporations in this case stand to gain extraordinary financial benefits if the transactions entered into here are constitutional. Regardless of the source of funds used to acquire the pollution control facilities, the private corporations are eligible for a federal income tax investment tax credit of up to 7 percent of the pollution control facilities' cost, a federal tax depreciation deduction of up to 100 percent of the value of the pollution control facilities, a state sales tax exemption under RCW 82.34.050, and state business and occupation tax credits of up to 50 percent of the pollution control facilities' cost. RCW 82.34.060. In addition, respondents stipulated that the availability of the municipal bond market as a borrowing source to Weyerhaeuser alone, assuming only a $13 million bond issue (the bond issue authorized

for Weyerhaeuser is $30 million), a 2 percent differential between the premium on a municipal bond and a high grade corporate bond, and a 25-year bond life would have represented a savings to Weyerhaeuser of $6.5 million.

■ Our function is not to weigh the economic impact of the transactions. The loan of money or credit by a municipality to a private corporation is a violation of our state constitution regardless of whether or not it serves a laudable public purpose. "If the framers of the constitution had intended only to prohibit counties from giving money or loaning credit for other than . . . public purposes, they would doubtless have said so in direct words." *Johns v. Wadsworth,* 80 Wash. 352, 354, 141 P. 892 (1914).

■ We hold the Laws of 1973, ch. 132 and Laws of 1972, 1st Ex. Sess., ch. 54, § 1 insofar as they purport to authorize the transactions before us, unconstitutional. The transactions entered into are violations of Const. art. 8, § 7. The constitutionality of these transactions is not saved as to the Port of Longview and Port of Tacoma by Const. art. 8, § 8 (amendment 45). That amendment provides: "The use of public funds by port districts in such manner as may be prescribed by the legislature for industrial development or trade promotion and promotional hosting shall be deemed a public use for a public purpose, and shall not be deemed a gift within the provisions of section 7 of this Article." There is nothing in article 8, section 8 which would authorize this type of "financing lease agreement." That section appears to speak to problems arising from our opinions in *Hogue v. Port of Seattle,* 54 Wn.2d 799, 341 P.2d 171 (1959) and *State ex rel. O'Connell v. Port of Seattle,* 65 Wn.2d 801, 399 P.2d 623 (1965). This is made clear by official explanatory comments of the Attorney General in the voters pamphlet submitted to the voters of this state and in the Statement For Senate Joint Resolution 25 contained in that pamphlet. In answer to the caption therein "Why SJR 25 is on the ballot:" the pamphlet stated "The Washington State Supreme Court in 1965 overruled opin-

ions and practices in force for many years and said ports of this state could no longer spend money for promotion unless specifically authorized by a vote of the people." The official explanatory comments of the Attorney General were:

> The Law as it now exists:
>
> Present state constitutional provisions prohibit the expenditure of public money for nonpublic purposes. In a recent decision the supreme court indicated that port districts could not expend funds for the purpose of acquiring and developing industrial sites for the use of or resale to private industry. In its decision the court stated that industrial development is not a public purpose.
>
> Other state constitutional provisions prohibit the state and its political subdivisions from making gifts of public money or property to private individuals. The state supreme court has recently interpreted these provisions to mean that port districts in our state cannot expend public funds for a certain type of promotional or advertising activity known as promotional hosting. Promotional hosting in the case of port districts is generally understood to mean hosting individuals and groups of individuals at lunch or dinner for the purpose of cultivating trade relations and promoting business for the port.

The court in analyzing legislation may look to both the legislative history and explanatory statements and arguments in the official voters pamphlet. *Lynch v. Department of Labor & Indus.*, 19 Wn.2d 802, 145 P.2d 265 (1944).

In *Hogue*, we held some provisions of RCW 53.25 violated Const. art. 1, § 16 (amendment 9), that the taking of certain land was not for public use and that the use of proceeds of a tax levy to purchase such land was therefore not for a public purpose. In *O'Connell*, we held promotional hosting by port districts of prospective users of port facilities was forbidden by article 8, section 7.

The Supreme Court of Florida, faced with a similar problem of determining legislative intent, held in *Jackson v. Consolidated Government of Jacksonville*, 225 So. 2d 497, 500-01 (Fla. 1969):

A new constitutional provision prevails over prior pro-

visions of the Constitution (a) if it specifically repeals them or (b) if it cannot be harmonized with them. Nevertheless, it is settled that implied repeal of one constitutional provision by another is not favored, and every reasonable effort will be made to give effect to both provisions. Unless the later amendment expressly repeals or purports to modify an existing provision, the old and new should stand and operate together unless the clear intent of the latter provision is thereby defeated.

There was no such clear intent to repeal article 8, section 7, indicated in either the legislative history or voters pamphlet relating to Senate Joint Resolution 25, as that section relates to the transactions before us.

The language of Const. art. 8, § 8 (amendment 45) and the explanation given in the voters pamphlet do not bring this transaction within the scope of that amendment. The recent adoption of House Bill 100, Laws of 1975, ch. 6, cannot save this transaction. The legislative intent expressed prior to the adoption of Senate Joint Resolution 25, the language in the voters pamphlet, and the language of the amendment itself are all we can consider on the constitutional issue before us.

The judgment and order of the trial court is reversed.

FINLEY, ROSELLINI, HUNTER, HAMILTON, STAFFORD, WRIGHT, and BRACHTENBACH, JJ., and REVELLE, J. Pro Tem., concur.

Petitions for rehearing denied March 18, 1975.