LEWIS, J.
 

 The Attorney General of Florida has requested an opinion from this Court with regard to the validity of two initiative petitions sponsored by FairDistrictsFlori-da.org, a political committee. We have jurisdiction.
 
 See
 
 art. IV, § 10, art. V, § 3(b)(10), Fla. Const. We conclude that
 
 *179
 
 the proposed amendments comply with the single-subject requirement of article XI, section 3 of the Florida Constitution, and that the ballot titles and summaries comply with section 101.161(1), Florida Statutes (2008).
 

 I. THE PROPOSED AMENDMENTS
 

 The two amendments and their respective ballot titles and summaries are nearly identical except for references to legislative versus congressional boundaries. The full text of the proposed amendment that governs
 
 legislative-district
 
 boundaries states:
 

 Section 21. Add a new Section 21 to Article III
 

 STANDARDS FOR ESTABLISHING LEGISLATIVE DISTRICT BOUNDARIES
 

 In establishing Legislative district boundaries:
 

 (1) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
 

 (2) Unless compliance with the standards in this subsection conflicts with the standards in subsection (1) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
 

 (3) The order in which the standards within sub-sections (1) and (2) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.
 

 The ballot title for this proposed initiative is:
 

 STANDARDS FOR LEGISLATURE TO FOLLOW IN LEGISLATIVE REDISTRICTING.
 

 The ballot summary provides:
 

 Legislative districts or districting plans may not be drawn to favor or disfavor an incumbent or political party. Districts shall not be drawn to deny racial or language minorities the equal opportunity to participate in the political process and elect representatives of their choice. Districts must be contiguous. Unless otherwise required, districts must be compact, as equal in population as feasible, and where feasible must make use of existing city, county and geographical boundaries.
 

 The full text of the proposed amendment that governs
 
 congressional-district
 
 boundaries states:
 

 Add a new Section 20 to Article III Section 20. STANDARDS FOR ESTABLISHING CONGRESSIONAL DISTRICT BOUNDARIES
 

 In establishing Congressional district boundaries:
 

 (1) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
 

 (2) Unless compliance with the standards in this subsection conflicts with the standards in subsection (1) or with federal law, districts shall be as nearly
 
 *180
 
 equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
 

 (3) The order in which the standards within sub-sections (1) and (2) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.
 

 The ballot title for this proposal is:
 

 STANDARDS FOR LEGISLATURE TO FOLLOW IN CONGRESSIONAL REDISTRICTING.
 

 The ballot summary provides:
 

 Congressional districts or districting plans may not be drawn to favor or disfavor an incumbent or political party. Districts shall not be drawn to deny racial or language minorities the equal opportunity to participate in the political process and elect representatives of their choice. Districts must be contiguous. Unless otherwise required, districts must be compact, as equal in population as feasible, and where feasible must make use of existing city, county and geographical boundaries.
 

 II. ANALYSIS
 

 A. Single-Subject Requirement
 

 Article XI, section 3 of the Florida Constitution provides: “The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revision or amendment, except for those limiting the power of government to raise revenue,
 
 shall embrace but one subject and matter directly connected therewith.”
 
 (Emphasis supplied.) This Court has previously explained the rationale behind the single-subject requirement:
 

 The single-subject limitation exists because the initiative process does not provide the opportunity for public hearing and debate that accompanies the other methods of proposing amendments. Consequently, “[the] single-subject provision is a rule of restraint designed to insulate Florida’s organic law from precipitous and cataclysmic change.” This Court requires “strict compliance with the single-subject rule in the initiative process for constitutional change because our constitution is the basic document that controls our governmental functions, including the adoption of any laws by the legislature.” The single-subject requirement also prevents logrolling, a practice that combines separate issues into a single proposal to secure passage of an unpopular issue. Thus, voters are protected by the single-subject requirement because they are not forced to “accept part of an initiative proposal which they oppose in order to obtain a change in the constitution which they support.”
 

 Advisory Op. to Att’y Gen. re Amendment to Bar Gov’t From Treating People Differently Based on Race in Pub. Educ.,
 
 778 So.2d 888, 891 (Fla.2000) (citations omitted) (quoting
 
 In re Advisory Op. to Att’y Gen.
 
 —Save
 
 Our Everglades,
 
 636 So.2d 1336, 1339 (Fla.1994);
 
 Fine v. Firestone,
 
 448 So.2d 984, 988-89 (Fla.1984)). To determine whether a proposed amendment addresses a single subject, this Court must evaluate whether the proposal “may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme.”
 
 Advisory Op. to Att’y Gen. re Patients’ Right to Know About Adverse Med. Incidents,
 
 880 So.2d 617, 620 (Fla.2004) (quoting
 
 Fine v. Firestone,
 
 448 So.2d 984, 990 (Fla.1984)).
 

 A proposed amendment is not invalid merely because it affects more than one branch of government or may interact
 
 *181
 
 with other provisions of the Florida Constitution.
 
 See Advisory Op. to Att’y Gen. re Limited Casinos,
 
 644 So.2d 71, 74 (Fla.1994) (“[W]e find it difficult to conceive of a constitutional amendment that would not affect other aspects of government to some extent”). We have further explained that “the fact that [a] branch of government is required to comply with a provision of the Florida Constitution does not necessarily constitute the usurpation of the branch’s function within the meaning of the single-subject rule.”
 
 Advisory Op. to Att’y Gen. re Protect People, Especially Youth, From Addiction, Disease, & Other Health Hazards of Using Tobacco,
 
 926 So.2d 1186, 1192 (Fla.2006). Rather, “it is when a proposal substantially alters or performs the functions of multiple branches that it violates the single-subject test.”
 
 Patients’ Right to Know,
 
 880 So.2d at 620. Finally, speculation about possible impacts of a proposed amendment on other branches of government is premature when determining whether a proposed amendment,
 
 on its face,
 
 meets the single-subject requirement.
 
 See In re Advisory Op. to Att’y Gen. re English
 
 — The
 
 Official Language of Fla.,
 
 520 So.2d 11, 13 (Fla.1988) (approving placement of proposed amendment on the ballot even where “the amendment could have broad ramifications” because, “on its facet,] it deals with only one subject”).
 

 With regard to reapportionment, article III, section 16(a) of the Florida Constitution currently provides, in relevant part:
 

 (a) SENATORIAL AND REPRESENTATIVE DISTRICTS. The legislature at its regular session in the second year following each decennial census, by joint resolution, shall apportion the state in accordance with the constitution of the state and of the United States into not less than thirty nor more than forty consecutively numbered senatorial districts of either contiguous, overlapping or identical territory, and into not less than eighty nor more than one hundred twenty consecutively numbered representative districts of either contiguous, overlapping or identical territory.
 

 We conclude that the proposed amendments (1) encompass a single subject, (2) do not engage in logrolling, and (3) do not substantially alter the functions of multiple branches of government. The proposed amendments address a single function of a single branch of government — establishing additional guidelines for the Legislature to apply when it redistricts legislative and congressional boundaries. This Court has previously stated that under the state and federal Constitutions, the only requirements for a redistricting plan are: (1) compliance with the equal protection standard of one-person, one-vote — i.e., that “legislatures be apportioned in such a way that each person’s vote carries the same weight”; and (2) that districts consist of contiguous, overlapping, or identical territory.
 
 In re Constitutionality of House Joint Resolution 1987,
 
 817 So.2d 819, 824-25 (Fla.2002) (quoting
 
 In re Constitutionality of Senate Joint Resolution 2G,
 
 597 So.2d 276, 278 (Fla.1992)).
 

 Logrolling
 
 — Although the Legislature contends that the proposals violate the single-subject rule because they implement multiple reapportionment standards, such an interpretation of the rule is far too narrow. The overall goal of the proposed amendments is to require the Legislature to redistrict in a manner that prohibits favoritism or discrimination, while respecting geographic considerations. Although the proposed amendments delineate a number of guidelines, we conclude that these components possess “a natural relation and connection as component parts or aspects of a single dominant plan or
 
 *182
 
 scheme.”
 
 Patients’ Right to Know,
 
 880 So.2d at 620 (quoting
 
 Fine,
 
 448 So.2d at 990).
 

 The instant case is distinguishable from others in which this Court has determined that proposals have violated the single-subject requirement. For example, in
 
 In re Advisory Opinion to Attorney General
 
 — Restricts
 
 Laws Related to Discrimination,
 
 632 So.2d 1018, 1019 (Fla.1994)
 
 (Discrimination ),
 
 the proposed amendment sought to prohibit discrimination based on ten separate classifications — race, color, religion, sex, national origin, age, handicap, ethnic background, marital status, and familial status. While the sponsor contended that the amendment addressed the single subject of discrimination, we rejected this contention and instead concluded that the proposal “enfold[ed] disparate subjects within the cloak of a broad generality” in violation of the single-subject requirement.
 
 Id.
 
 at 1020 (quoting
 
 Evans v. Firestone,
 
 457 So.2d 1351, 1353 (Fla.1984)). We explained:
 

 The voter is essentially being asked to give one “yes” or “no” answer to a proposal that actually asks ten questions. For example, a voter may want to support protection from discrimination for people based on race and religion, but oppose protection based on marital status and familial status. Requiring voters to choose which classifications they feel most strongly about, and then requiring them to cast an all or nothing vote on the classifications listed in the amendment, defies the purpose of the single-subject limitation.
 

 Id.
 
 at 1020. Unlike the provision in
 
 Discrimination,
 
 the proposals in the instant cases do not group multiple subjects under the cloak of “redistricting.” Rather, they address
 
 solely
 
 the
 
 guidelines
 
 to be applied in legislative and congressional reapportionment. Thus, the instant proposals are also distinguishable from the proposed amendment in
 
 Advisory Opinion to Attorney General re Independent Nonpartisan Commission to Apportion Legislative & Congressional Districts Which Replaces Apportionment by Legislature,
 
 926 So.2d 1218 (Fla.2006) (Nonpartisan), which we determined to be in violation of the single-subject requirement. The proposal in
 
 Nonpartisan
 
 sought not only to implement redistricting standards,
 
 but to also create an entirely new commission
 
 to replace the Legislature as the entity responsible for reapportionment in Florida.
 
 See id.
 
 at 1225. The proposed amendments here do
 
 not
 
 encompass two such disparate functions.
 

 The proposed amendments here are more similar to proposals we have previously approved because they encompassed a single plan and merely enumerated various elements necessary to accomplish that plan. In
 
 Health Hazards of Using Tobacco,
 
 926 So.2d at 1189, this Court approved for placement on the ballot a proposed amendment that would create a comprehensive statewide tobacco education and prevention program. The program was designed to encompass an advertising campaign, the creation of programs to educate youth about tobacco, enforcement of laws against the sale of tobacco to minors, and annual evaluations of the effectiveness of the program.
 
 See id.
 
 Further, the proposal included a provision which required that the Legislature appropriate fifteen percent of the gross funds collected from a tobacco settlement to the program.
 
 See id.
 
 This Court held that despite the various components, the proposal did not engage in logrolling:
 

 It addresses a single comprehensive plan for the education of youth about the health hazards related to tobacco. Although this plan includes a list of components such as advertising, school curri
 
 *183
 
 cula, and law enforcement, all of these components are related to the single unifying purpose. It does not “combine subjects in such a manner as to force voters to accept one proposition they, might not support in order to vote for one they favor.”
 
 Advisory Op. to Att’y Gen. re Fla.’s Amendment to Reduce Class Size,
 
 816 So.2d 580, 588 (Fla.2002). In other words, the proposed amendment does not combine unrelated provisions, some of which are popular and others that may be disfavored.
 

 Id.
 
 at 1191-92. Similarly, here, the various components within the proposed amendments are directed to the single unified purpose of establishing standards by which legislative and congressional districts are to be drawn. Accordingly, we hold that the proposed amendments address a single subject.
 

 Multiple Government
 
 Functions— The Legislature next asserts that the proposals will essentially shift the duty of reapportionment to the judiciary and, therefore, the proposals impact multiple branches of government in violation of the single-subject rule. This contention is without merit. Under the Florida Constitution, after the Legislature drafts a reapportionment plan, the attorney general files a request with this Court for a “declaratory judgment” with regard to the validity of the plan. Art. Ill, § 16(c), Fla. Const. If this Court rejects the plan, the Governor must reconvene the Legislature for an “extraordinary apportionment session,” during which the Legislature must adopt a joint resolution that conforms to this Court’s judgment.
 
 Id.
 
 § 16(d). If the extraordinary session fails to produce a resolution of apportionment, or if this Court holds that the subsequent apportionment is invalid, the Court “shall, not later than sixty days after receiving the petition of the attorney general, file with the custodian of state records an order making such apportionment.”
 
 Id.
 
 § 16(f).
 

 As noted by FairDistrictsFlorida.org, the Florida Constitution currently contains no guidelines for congressional dis-tricting. However, article I, section 2 of the United States Constitution provides: “The House of Representatives shall be composed of Members chosen every second Year by the People of the several States.... ” The Fourteenth Amendment of the United States Constitution provides that “Representatives shall be apportioned among the several states according to their respective numbers.” The United States Supreme Court has held that the federal Constitution “leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts.”
 
 Growe v. Emison,
 
 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). In
 
 Wesberry v. Sanders,
 
 376 U.S. 1, 4, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Supreme Court held that a one-person, one-vote constitutional challenge to congressional reapportionment by a state legislature is a justiciable issue.
 

 The proposed amendments do not alter the functions of the judiciary. They merely change the standard of review to be applied when either the attorney general seeks a “declaratory judgment” with regard to the validity of a legislative apportionment, or a redistricting plan is challenged. This effect of the proposed amendments does not constitute a substantial alteration of the functions of the judicial branch.
 
 See Health Hazards of Using Tobacco,
 
 926 So.2d at 1192 (“[T]he fact that [a] branch of government is required to comply with a provision of the Florida Constitution does not necessarily constitute the usurpation of the branch’s function within the meaning of the single-subject rule.”).
 

 
 *184
 
 The contention of the Legislature that a redistricting plan can never comply with the amendment guidelines and, therefore, the role of reapportionment will always fall upon the courts — thereby substantially changing a function of the courts — is speculative argument. There is no basis that the judiciary will reject any redistricting plan that the Legislature adopts for failure to comply with the guidelines. We must assume the Legislature will comply with the law at the time an apportionment plan is adopted. Moreover, such speculation with regard to a possible impact of the proposals on the judicial branch is premature because we need only determine at this time whether the proposed amendments,
 
 on their face,
 
 satisfy the single-subject requirement.
 
 See English
 
 — The
 
 Official Language,
 
 520 So.2d at 13.
 

 In light of the foregoing, we hold that the proposed amendments comply with article XI, section 3 of the Florida Constitution.
 

 B. Ballot Title and Summary
 

 The requirement that a ballot title and summary comply with section 101.161(1), Florida Statutes (2008), was recently explained by this Court as follows:
 

 [A]ny proposed constitutional amendment must be “accurately represented on the ballot; otherwise, voter approval would be a nullity.”
 
 Armstrong v. Harris,
 
 773 So.2d 7, 12 (Fla.2000). Section 101.161(1), Florida Statutes (2007), codifies this principle:
 

 Whenever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment or other public measure shall be printed in
 
 clear and unambiguous language
 
 on the ballot.... Except for amendments and ballot language proposed by joint resolution, the substance of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.... The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.
 

 (Emphasis supplied.)
 
 See also Askew v. Firestone,
 
 421 So.2d 151, 155 (Fla.1982) (“[T]he voter should not be misled.... All that the Constitution requires or that the law compels or ought to compel is that the voter have notice of that which he must decide....
 
 What the law requires is that the ballot be fair and advise ■ the voter sufficiently to enable him intelligently to cast his ballot.”
 
 (alteration in original) (quoting
 
 Hill v. Milander,
 
 72 So.2d 796, 798 (Fla.1954))).... To determine whether the ballot title and summary of [the proposed amendment] satisfy the requirements of section 101.161, Florida Statutes (2007), the Court must consider two questions: “(1) whether the ballot title and summary, in clear and unambiguous language, fairly inform the voter of the chief purpose of the amendment; and (2) whether the language of the title and summary, as written, misleads the public.”
 
 Advisory Opinion to Attorney Gen. re Prohibiting State Spending for Experimentation that Involves the Destruction of a Live Human Embryo,
 
 959 So.2d 210, 213-14 (Fla.2007) (quoting
 
 Advisory Opinion to Attorney Gen. re Fla. Marriage Prot. Amendment,
 
 926 So.2d 1229, 1236 (Fla.2006)). We do not consider, nor do we address, the substantive merit of the proposed amendment.
 

 ... This Court has recognized that it must exercise extreme caution and restraint before removing a constitutional amendment from Florida voters.
 
 See Advisory Opinion to Attorney Gen. re
 
 
 *185
 

 Fla. Marriage Prot. Amendment,
 
 926 So.2d 1229, 1233 (Fla.2006). We have farther noted that we have no authority to inject this Court into the process, unless the laws governing the process have been “clearly and conclusively” violated.
 
 Advisory Opinion to the Attorney Gen. re Right to Treatment & Rehab. for Non-Violent Drug Offenses,
 
 818 So.2d 491, 498-99 (Fla.2002).
 

 Fla. Dep’t of Rev. v. Slough,
 
 992 So.2d 142, 146-47 (Fla.2008). Despite these various requirements, we have also noted that even though a ballot summary could have better explained the text of the amendment, that fact alone does
 
 not
 
 require a proposal to be struck:
 

 There is no requirement that the referendum question set forth the [text] verbatim nor explain its complete terms at great and undue length. Such [requirements] would hamper instead of aiding the intelligent exercise of the privilege of voting. Under our system of free elections, the voter must acquaint himself with the details of a proposed ordinance on a referendum together with the pros and cons thereon before he enters the voting booth. If he does not, it is no function of the ballot question to provide him with that needed education. What the law very simply requires is that the ballot give the voter fair notice of the question he must decide so that he may intelligently cast his vote.
 

 Advisory Op. to Att’y Gen. re Right to Treatment & Rehab, for Non-Violent Drug Offenses,
 
 818 So.2d 491, 498 (Fla.2002) (quoting
 
 Metro. Dade County v. Shiver,
 
 365 So.2d 210, 213 (Fla. 3d DCA 1978),
 
 aff'd sub nom. Miami Dolphins v. Metro. Dade County,
 
 394 So.2d 981 (Fla.1981)). Moreover, inadvertent use of different but clearly synonymous terms in the proposed amendment and the summary will
 
 not
 
 render a ballot summary fatally defective where “[t]he differing use of terminology could not reasonably mislead the voters.”
 
 English
 
 — The
 
 Official Language,
 
 520 So.2d at 13 (use of the phrase “to
 
 implement
 
 this
 
 article
 
 ” in the ballot summary not misleading where the text of the proposed amendment actually provided “to
 
 enforce
 
 this
 
 section”
 
 (alteration in original)).
 

 The Legislature presents multiple claims that the ballot titles and summaries for the proposed amendments are misleading. We address each of those arguments.
 

 Ballot title
 
 — The Legislature first asserts that the titles are misleading because they indicate that only the Legislature must comply with the new redistricting standards where, in fact, the judiciary will be similarly obligated to apply these standards when ■ a legislative attempt at reapportionment fails and the courts are required to redraw the districts. We conclude that this challenge is without merit.
 

 As previously discussed, the proposed amendments have one chief purpose: to provide the Legislature with guidelines to follow when it draws legislative and congressional boundaries. ' Thus, it is logical that the titles would only reference the Legislature. Although the Legislature might ultimately fail to comply with these standards, this contingency does not translate into a need for the ballot titles to indicate that the standards apply to the judiciary. Rather, it can logically be presumed that if the Legislature fails to comply with the Constitution and follow the applicable standards, the entity responsible for redrawing the boundaries must also comply with these standards. The failure to mention the judiciary in the ballot titles does not render them misleading.
 

 “Drawn to favor” vs. “Drawn with the intent to favor”
 
 — The amendment summaries provide that redistricting plans
 
 *186
 
 “shall not be drawn to favor or disfavor an incumbent or political party”; however, the body of the proposals provide that districting plans “shall not be drawn
 
 with the intent
 
 to favor or disfavor an incumbent or political party.” (Emphasis supplied.)- According to the Legislature, the summaries indicate that the
 
 effect
 
 of a reapportionment plan cannot be to favor or disfavor anyone or any party; however, under the proposed amendments, proof of
 
 intent
 
 to favor an incumbent or party must be demonstrated before a reapportionment plan will be rejected for noncompliance. The Legislature contends that the summaries are misleading because voters will believe that the proposals prohibit reapportionment plans whose
 
 effect
 
 is to favor a party or incumbent, while the- amendments actually permit districts that favor a party or incumbent, provided that the district lines were drawn without intending that result.
 

 We reject this assertion. The ballot summaries are currently seventy-four words in length. Hence, to add the words “with the intent” to the ballot summaries would exceed the statutory word limit. Thus, at issue in this case is whether the omission of these three words from the summaries (likely in an attempt to comply with the statutory word limit) causes them to be fatally misleading. As previously noted, a ballot summary need not (and because of the statutory word limit, often cannot) explain “at great and undue length” the complete details of a proposed amendment, and some onus falls upon voters to educate themselves about the substance of the proposed amendment.
 
 Right to Treatment & Rehabilitation,
 
 818 So.2d at 498 (voters must acquaint themselves with the details of a proposed amendment together with the pros and cons thereon before they enter the voting booth and if they: do not, it is no function of the ballot to provide that needed education). Here, the proposed amendments are relatively short and straightforward. The text clearly highlights that for a redistricting plan to run afoul of the proposals, the conduct by the Legislature must be
 
 intentional.
 

 Additionally, such an intent requirement has been historically applied with regard to allegations of gerrymandering in reapportionment. For example, this Court has held that a discriminatory
 
 effect
 
 is not sufficient to prove racial discrimination in redistricting; rather, a discriminatory
 
 intent
 
 must be demonstrated:
 

 This invidious intent or purpose of racial discrimination, the Supreme Court explained, cannot be proved by merely showing that the group discriminated against has not elected representatives in proportion to its numbers. Disproportionate effects alone will not establish a claim of unconstitutional racial vote dilution. Rather, “[a] plaintiff must prove that the disputed plan was conceived or operated as a purposeful device to further racial discrimination.” Proof of a discriminatory effect is not sufficient.
 

 Milton v. Smothers,
 
 389 So.2d 978, 981-82 (Fla.1980) (quoting
 
 City of Mobile v. Bolden,
 
 446 U.S. 55, 66, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980)). Thus, when implementing additional constitutional apportionment standards — here, that district boundaries not be drawn to favor a party or incumbent — it is logical to presume (and the text of the amendments require) that the
 
 intent
 
 of the entity that draws the districts must similarly be considered when determining whether those standards have been violated.
 

 Moreover, to add the “with the intent” language to the proposed summaries would require removal of at least two other words for the summaries to comply with the seventy-five-word statutory limit. The
 
 *187
 
 Legislature fails to indicate which of the current seventy-four words could be removed without creating another claim that the summaries are vague or misleading. Indeed, it is likely impossible to draft summaries that explain
 
 all
 
 of the details sought by the Legislature within the statutory-word limit. While ideal summaries for these amendments might have included the words “with the intent,” we conclude that — given the strict word limits — the failure of the summaries to include these three words does not render them so misleading as to clearly and conclusively violate section 101.161, Florida Statutes.
 
 See Right to Treatment & Rehabilitation,
 
 818 So.2d at 498 (holding that failure of ballot summary to explain that proposed amendment is self-effectuating did not render the summary misleading and noting that “imperfection is not necessarily fatal given the seventy-five word statutory maximum”).
 

 Shift of Authority
 
 — The Legislature next contends that the summaries are misleading because they fail to mention that the proposed amendments divest the Legislature of its responsibility to draw legislative and congressional districts and transfer this role to the judiciary. However, we have already concluded that the proposed amendments do not substantially alter the functions of multiple branches of government. Rather, under the proposals, the judiciary maintains the same role as it has always possessed — to only review apportionment plans for compliance with state and federal constitutional requirements and to adjudicate challenges to redistricting plans. The proposed amendments do not shift in any way the authority of the Legislature to draw legislative and congressional districts to the judicial branch. Accordingly, the summaries are not misleading for the failure to mention this purported “effect” of the proposals.
 

 “City/County” boundaries vs. “Political” Boundaries
 
 — The ballot summaries state that district boundaries shall, where feasible, utilize existing “city, county and geographical boundaries”; however, the body of the amendments provide that districts must use “existing
 
 political
 
 and geographical boundaries.” (Emphasis supplied.) The Legislature asserts that the term “political boundaries” encompasses more than city or county boundaries, and under the Florida Statutes, this State has many special districts — such as voting precincts and water-management districts— the borders of which would constitute “political boundaries.” Thus, to the extent that the summaries use language inconsistent with that of the proposed amendments, the Legislature contends that they are misleading.
 

 Although the phrase “political and geographical boundaries” used in the proposed amendments may be technically broader than the “city, county, and geographical boundaries” phrase used in the summaries, we conclude that this differing use of terminology could not reasonably mislead voters. The sponsor asserts that the terms “city” and “county” are utilized in the summaries because they are more understandable to the average citizen than the legal concept of “political” boundaries. We agree that most voters clearly understand the concept of a city or county boundary, but may be perplexed to define exactly what a “political boundary” may encompass.
 
 See Askew v. Firestone,
 
 421 So.2d 151, 155 (Fla.1982) (noting that voters “must be able to comprehend the sweep of each proposal” (quoting
 
 Smathers v. Smith,
 
 338 So.2d 825, 829 (Fla.1976))). The purpose of the standards in section (2) of the proposals is to require legislative and congressional districts to follow existing community lines so that districts are logically drawn, and bizarrely shaped dis
 
 *188
 
 tricts — such as one senate district that was challenged in
 
 Resolution 1987,
 
 817 So.2d at 824-25 — are avoided.
 
 [1]
 
 Since the “city” and “county” terminology honors this community-based standard for drawing legislative and congressional boundaries, and further describes the standards in terms that are readily understandable to the average voter, we conclude that the use of different terminology does not render the summaries misleading.
 

 The Aiid/Or Distinction
 
 — -Under this" challenge, the Legislature contends that the summaries are misleading because while they provide that “[districts shall not be drawn to deny racial or language minorities the equal opportunity to participate in the political process
 
 and
 
 elect representatives of their choice,” the proposed amendments provide that “districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process
 
 or
 
 to diminish their ability to elect representatives of their choice.” (Emphasis supplied.) According to the Legislature, the “or” in the proposals demonstrates that an apportionment plan need satisfy
 
 only one
 
 of the two conditions to comply with the amendment — either districts must not be drawn to deny racial or language minorities the equal opportunity to participate in the political process
 
 or
 
 districts must not be drawn to diminish the ability of racial or language minorities to elect representatives of their choice. According to the Legislature, both standards need not be accomplished. Conversely, the Legislature posits that use of the word “and” in the summary indicates that
 
 both
 
 standards must be satisfied to comply with the amendments — thus, the summaries are misleading because they promise more than is required under the proposed amendments.
 

 We conclude that the logic of the Legislature is faulty. In support of its assertion, the Legislature relies upon the case
 
 Armstrong v. Harris,
 
 773 So.2d 7, 16 (Fla.2000), in which this Court held that a ballot title which read “United States Supreme Court Interpretation of Cruel and Unusual Punishment” and a summary which provided that the proposed amendment “[rjequires construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment” were affirmatively misleading.
 
 See
 
 773 So.2d at 16-17. This Court explained that although the title offered the impression that “the amendment will promote the rights of Florida citizens through the rulings of the United States Supreme Court,” the amendment actually restricted the rights of Floridians because the United States Constitution ban against “cruel
 
 and
 
 unusual” punishment provided fewer protections than the Florida Constitution ban on “cruel
 
 or
 
 unusual punishment.”
 
 Id.
 
 at 17. Thus, the “or” carried special significance because it prohibited punishment that is
 
 either
 
 cruel
 
 or
 
 unusual,, whereas under the United States Constitution, the punishment is prohibited only if it is both cruel
 
 and
 
 unusual.
 

 However, the proposal in
 
 Armstrong
 
 is distinguishable from the proposed amendments that we review today. While the word “or” in the
 
 Armstrong
 
 proposal was used in conjunction with two adjectives, here the word “or” separates two clauses of a sentence which share the same nega
 
 *189
 
 tive verb; i.e., “shall not be drawn.” This verb modifies both clauses, thereby indicating that
 
 both
 
 clauses impose a restrictive imperative,
 
 each of which must be satisfied.
 
 For example, if a statute provides that “one person shall not kill another
 
 or
 
 cause him/her grievous bodily harm,” it is illogical to suggest that the statute prohibits one action
 
 but not the other.
 
 Rather, the “shall not” unquestionably applies to both
 
 actions
 
 — both killing
 
 and
 
 causing grievous bodily harm are prohibited. Similarly, the negative verb “shall not be drawn” in the proposed amendments modifies both clauses “with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process” and “to diminish their ability to elect representatives of their choice.” Under this sentence,
 
 both
 
 effects are prohibited.
 
 [2]
 
 Thus, use of the word “or” in the proposals is synonymous with the word “and” in the summaries. Because the use of synonymous terms is not misleading, this challenge by the Legislature fails.
 
 See English
 
 — The
 
 Official Language,
 
 520 So.2d at 13 (use of synonymous terms will not render summary fatally defective where the use of different terms could not reasonably mislead voters).
 

 Language Minorities
 
 — The Legislature’s claim that this term is vague or ambiguous is not persuasive. The term “language minorities” is both legally and commonly understood to refer to any language other than English.
 
 See, e.g.,
 
 42 U.S.C. § 1973b(f)(l) (“The Congress finds that voting discrimination against citizens of
 
 language minorities
 
 is pervasive and national in scope. Such minority citizens are from environments
 
 in which the dominant language is other than
 
 English.” (emphasis supplied));
 
 Briscoe v. Bell,
 
 432 U.S. 404, 405, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977) (“[A]s part of the 1975 amendments to the Voting Rights Act ... Congress extended the Act’s strong protections to cover language minorities; that is,
 
 citizens living in environments where the dominant language is not English.”
 
 (emphasis supplied));
 
 Biddulph v. Mortham,
 
 89 F.3d 1491, 1498 (11th Cir.1996) (“The plaintiffs argued that the proposal’s sponsors failed to comply with a provision of the Voting Rights Act requiring that certain jurisdictions subject to rules
 
 prohibiting discrimination against language minorities
 
 provide ‘materials or information relating to the electoral process’ in the minority group’s language
 
 as well as English.”
 
 (emphasis supplied)). The Legislature’s contention that voters may be confused by the term “language minorities” is even more dubious in light of the fact that the Florida Constitution contains a provision providing that
 
 English is the official language of Florida. See
 
 art. II, § 9, Fla. Const. Use of this term does not render the summaries misleading.
 

 Elimination of Multi-Member Districts
 
 — Lastly, the Legislature contends that the summary of the legislative-boundary proposal is misleading because it fails to inform voters that it changes the Florida Constitution to no longer permit multi-member legislative districts and to mandate single-member legislative districts.
 
 [3]
 

 
 *190
 
 The Florida Constitution currently mandates that legislative districts consist of either “contiguous, overlapping or identical territory.” Art. Ill, § 16(a), Fla. Const. In 1972, we held that this language permits multi-member legislative districts:
 

 [Tjhe Constitution requires that there be one senator elected from each Senatorial district and. one member of the House of Representatives elected from each representative district. This, standing alone, would require single-member districts. However, the Constitution further provides that districts may be “identical territory.” This means that multi-members of the Senate or the House of Representatives may be elected from the identical territory if such territory were designated as constituting several districts. To require single-member districts would void the provision of Fla. Const., art. Ill, § 16(a) ... authorizing the creation of districts in “identical territory.”
 

 [[Image here]]
 

 Under the provisions of Fla. Const., art. Ill, § 1 and 16 ... multi-member districts are permissible and such multi-member districts may coexist with single-member districts in the same plan.
 

 In re Apportionment Law Senate Joint Resolution No. 1305,
 
 263 So.2d 797, 806-07 (Fla.1972).
 

 The Legislature contends that adoption of the proposed legislative-boundary amendment — which includes a “contiguous” requirement but does not mention overlapping or identical districts — operates to repeal article III, section 16(a) of the Florida Constitution. Under this rationale the Legislature argues that because identical districts are no longer permitted, the proposal amends the Florida Constitution to implement a single-member district requirement, and the ballot summary fails to inform voters of this significant change.
 
 See Nonpartisan,
 
 926 So.2d at 1226 (noting that the “identical territory” provision in article III, section 16(a) permits the creation of multi-member districts).
 

 We disagree that adoption of the legislative-boundary proposal will have the asserted effect. This Court has explained:
 

 A new constitutional provision prevails over prior provisions of the Constitution (a) if it specifically repeals them or (b) if it cannot be harmonized with them. Nevertheless, it is settled that
 
 implied repeal of one constitutional provision by another is not favored,
 
 and every reasonable effort will be made to give effect to both provisions. Unless the later amendment expressly repeals or purports to modify an existing provision,
 
 the old and new should stand and operate together unless the clear intent of the later provision is thereby defeated.
 

 Jackson v. City of Jacksonville,
 
 225 So.2d 497, 500-501 (Fla.1969) (emphasis supplied). Since the legislative-boundary proposal does
 
 not
 
 expressly repeal section 16(a), this constitutional provision will be considered repealed by implication
 
 only if
 
 it cannot be harmonized with the proposal.
 

 We conclude that harmonization of these two provisions is possible and, therefore, “identical” multi-member districts in Florida will still be constitutionally permissible even if the legislative-boundary proposal is adopted. In 1982, this Court clarified that the word “contiguous” in article III, section 16(a) “means only that each district must be contiguous
 
 within itself”
 
 and does not refer “to the relationship of the districts to each other.”
 
 In re Apportionment Law Appearing as Senate Joint Resolution No. 1E,
 
 414 So.2d 1040, 1045, 1050 (Fla.1982) (emphasis supplied).
 
 *191
 
 Thus, under this Court’s prior case law, the reference to “contiguous” in the proposed legislative-boundary amendment solely addresses the characteristics of an individual district — not its relationship with any other district. Accordingly, a constitutional contiguity requirement for each individual district may exist, bub — at the same time — an individual district may still overlap with, or be identical to, another individual district. Because these two provisions can be harmonized in such a manner, the proposed legislative-boundary proposal would not operate to repeal article III, section 16(a).
 
 [4]
 

 Since the legislative-boundary proposal does not have the effect of prohibiting multi-member districts, the ballot summary is not misleading for the failure to mention this purported “effect.”
 

 III. CONCLUSION
 

 In conclusion, we hold that the proposed amendments meet the legal requirements of article XI, section 3 of the Florida Constitution, and the ballot titles and summaries comply with section 101.161(1), Florida Statutes (2008). Accordingly, we approve the amendments for placement on the ballot.
 

 It is so ordered.
 

 QUINCE, C.J., and ANSTEAD, Senior Justice, concur.
 

 WELLS, CANADY, and POLSTON, JJ., concur in result only.
 

 PARIENTE, J., recused.
 

 [1]
 

 . That senate district connected a region of Lee County with a region of Palm Beach County across the waters of Lake Okeechobee without any connecting territory on either the northem or southern shores of the lake.
 
 See id.
 
 at 828. Thus, the only way to travel from one end of the district to the other without passing through another district was by boat.
 

 [2]
 

 . One legal dictionary has explained:
 

 "[0]r" has an inclusive sense as well as an exclusive sense. Hence:
 

 [[Image here]]
 

 • The "inclusive
 
 or
 
 A or B, or both
 

 • The "exclusive or”: A or B, but not both.
 

 Bryan A. Gamer,
 
 A Dictionary of Modem Legal Usage
 
 624 (2d ed.1995).
 

 [3]
 

 . In
 
 Branch v. Smith,
 
 538 U.S. 254, 273, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003), the Supreme Court determined that "that in enacting 2 U.S.C. § 2c, Congress mandated that States are to provide for the election of their
 
 *190
 
 Representatives from single-member districts.” Thus, even if the congressional-boundary amendment were interpreted to mandate single-member districts, this proposal would be consistent with federal law.
 

 [4]
 

 . The proposals here are decidedly different from the proposed amendment that this Court struck from the ballot in
 
 Nonpartisan.
 
 In
 
 Nonpartisan,
 
 the proposal deleted article III, section 16(a)
 
 in its entirety
 
 and inserted a new section 16(a), which would have required “single-member” districts of "convenient contiguous .territory.”
 
 See
 
 926 So.2d at 1221. Thus, in
 
 Nonpartisan,
 
 there was an express repeal of the constitutional provision that allowed districts to be overlapping and identical.