LEWIS, J.
The Attorney General of Florida has requested an opinion from this Court with regard to the validity of the Financial Impact Statements prepared by the Financial Impact Estimating Conference for two proposed amendments to the Florida Constitution submitted by FairDistrictsFlori-da.org, a political committee.[1] We have jurisdiction. See art. IV, § 10, art. V, § 3(b)(10), Fla. Const.
The purpose of the proposed amendments is to establish additional guidelines for the Legislature to apply when it redistricts legislative and congressional boundaries.[2] The financial impact statements for the proposals are identical:
*163 The amendment’s fiscal impact cannot be determined precisely. State government will probably incur increased costs (millions of dollars), including attorney and expert witness fees, due to expected additional litigation regarding the application and interpretation of the amendment standards as they relate to proposed redistricting plans. Also, state courts will likely incur additional costs to preside over hearings and render rulings. There is no expected impact to local government expenditures or government revenues.
ANALYSIS
Article XI, section 5 of the Florida Constitution, which addresses financial impact statements, provides in relevant part:
(c) The legislature shall provide by general law, prior to the holding of an election pursuant to this section, for the provision of a statement to the public regarding the probable financial impact of any amendment proposed by initiative pursuant to section 3.
Section 100.371, Florida Statutes (2008), addresses financial impact statements and provides:
(5)(a) Within 45 days after receipt of a proposed revision or amendment to the State Constitution by initiative petition from the Secretary of State, the Financial Impact Estimating Conference shall complete an analysis and financial impact statement to be placed on the ballot of the estimated increase or decrease in any revenues or costs to state or local governments resulting from the proposed initiative. The Financial Impact Estimating Conference shall submit the financial impact statement to the *164 Attorney General and Secretary of State.
[[Image here]]
(c) ... 2. Principals of the Financial Impact Estimating Conference shall reach a consensus or majority concurrence on a clear and unambiguous financial impact statement, no more than 75 words in length, and immediately submit the statement to the Attorney General. Nothing in this subsection prohibits the Financial Impact Estimating Conference from setting forth a range of potential impacts in the financial impact statement. ...
(e)l. Any financial impact statement that the Supreme Court finds not to be in accordance with this subsection shall be remanded solely to the Financial Impact Estimating Conference for redrafting, provided the court’s advisory opinion is rendered at least 75 days before the election at which the question of ratifying the amendment will be presented. The Financial Impact Estimating Conference shall prepare and adopt a revised financial impact statement no later than 5 p.m. on the 15th day after the date of the court’s opinion.
We have previously explained that when we review a financial impact statement for compliance with section 100.371, we address “whether the statement is clear, unambiguous, consists of no more than seventy-five words, and is limited to addressing the estimated increase or decrease in any revenues or costs to the state or local governments.” Advisory Op. to Att’y Gen. re: Funding of Embryonic Stem Cell Research, 959 So.2d 195, 202 (Fla.2007). Because the financial impact statement will be printed on the ballot, the same due process concerns that inure to the title and summary of a proposed amendment are also applicable to the financial impact statement. See Askew v. Firestone, 421 So.2d 151, 155 (Fla.1982) (“[T]he voter should not be misled.... What the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot.” (alteration in original) (quoting Hill v. Milander, 72 So.2d 796, 798 (Fla.1954))). Accordingly, we have an obligation to review the ballot as a whole to ensure that no part of the ballot — which includes the financial impact statement— is misleading.
Our conclusion is supported by the applicable statutes. Section 101.161 requires that ballot titles and summaries “be printed in clear and unambiguous” language. § 101.161(1), Fla. Stat. (2008). Similarly, section 100.371 requires that the financial impact statement be “clear and unambiguous.” § 100.371(5)(c)2., Fla. Stat. (2008). We have held that the “clear and unambiguous” language in section 101.161(1) requires us to consider whether ballot titles and summaries are misleading to the public. See Fla. Dep’t of State v. Slough, 992 So.2d 142, 147 (Fla.2008). Accordingly, the use of the same language in section 100.371 mandates that we also consider whether the financial impact statement is misleading. See generally State v. Hearns, 961 So.2d 211, 217 (Fla.2007) (“[Wjhere the Legislature uses the exact same words or phrases in two different statutes, we may assume it intended the same meaning to apply.”). The rationale behind such a review is both clear and logical. It would make little sense to require that a proposed amendment title and summary not be misleading to voters, but then allow a financial impact statement that contains inaccurate or completely speculative predictions of potential financial impact to be placed on the ballot.
Contrary to the assertion of the dissent, when we reject a financial impact statute *165 for noncompliance with section 100.371, we do not substitute our judgment for that of the Conference. Rather, we are merely fulfilling our statutory duty to ensure that certain minimal requirements are met before a financial impact statement may be placed on the ballot and submitted to voters. The review is compelled by law so that financial impact statements do not devolve into a tool used to manipulate the public based solely upon whether the entity empowered and entrusted with preparing the statements favors or disfavors a proposal. Scare tactics and vague, unsupported predictions of financial disaster have no place in this constitutional-amendment process, and any predictions of financial impact must be grounded in fact, not partisan ideology. Otherwise, the core purpose of financial impact statements (i.e., to inform voters so that an educated decision may be made with regard to a proposed amendment) would be completely defeated.
We conclude that the financial impact statements for the proposed amendments do not comply with section 100.371, Florida Statutes (2008), and must therefore be rejected. It is undisputed that the Legislature currently has a duty to draw legislative and congressional districts every ten years. See art. Ill, § 16(a), Fla. Const.; §§ 8.0001-8.0002, Fla. Stat. (2003). The current amendments do not change this legislative duty, but only implement additional guidelines that the Legislature must follow when conducting reapportionment. Since the process remains the same, the assertion of the Financial Impact Estimating Conference that the financial impact of the amendments will be “millions of dollars” is more than questionable.[3] Instead, it is clear that the amendments would have no additional financial impact above the basic costs of reapportionment which are incurred during each decennial period.[4]
The Legislature’s assertion that additional costs will be accrued due to increased litigation challenging reapportionment under the new standards is also unavailing because history reflects that lawsuits are traditionally filed after the Legislature adopts any redistricting plan. Thus, litigation costs are routinely accrued by the government in response to each decennial reapportionment. Moreover, an information statement prepared by the Conference notes that the number of lawsuits filed in response to the 1990 and 2000 redistrictings actually decreased, which demonstrates that fluctuations occur in each ten-year apportionment. Accordingly, the purported establishment of a litigation-cost baseline by the Conference from which to measure any alleged increased cost of the proposed amend *166 ments is dubious and highly speculative. Moreover, the prediction of increased litigation is premised on the unsupported assumption that the Legislature will fail to adhere to the guidelines and fail to fulfill its constitutional duty.
CONCLUSION
For these reasons, we hold that the financial impact statements prepared by the Conference are fatally misleading and do not comply with section 100.371(5), Florida Statutes (2008). Thus, in accordance with our constitutional duty to ensure that Florida voters receive a fair and accurate ballot, see Askew, 421 So.2d at 155, we are compelled to reject the statements as drafted. We remand the statements to the Financial Impact Estimating Conference for redrafting. See § 100.371(5)(e)(l), Fla. Stat. (2008).
It is so ordered.
QUINCE, C.J., LABARGA, J., and ANSTEAD, Senior Justice, concur.
WELLS, J., dissents with an opinion, in which CANADY and POLSTON, JJ., concur.
PARIENTE, J., recused.

. We addressed whether the proposed amendments comply with the single-subject requirement of article XI, section 3 of the Florida Constitution, and whether the ballot titles and summaries comply with section 101.161(1), Florida Statutes (2008), in the companion case Advisory Opinion to the Attorney General re Standards for Establishing Legislative District Boundaries, Nos. SC08-986 & SC08-1149, 2 So.3d 175, 2009 WL 196401 (Fla. Jan. 29, 2009).

. The text of the proposals provide:
Section 21. Add a new Section 21 to Article III
STANDARDS FOR ESTABLISHING LEGISLATIVE DISTRICT BOUNDARIES
*163 In establishing Legislative district boundaries:
(1) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory-
(2) Unless compliance with the standards in this subsection conflicts with the standards in subsection (1) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
(3) The order in which the standards within sub-sections (1) and (2) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.
Add a new Section 20 to Article III
Section 20. STANDARDS FOR ESTABLISHING CONGRESSIONAL DISTRICT BOUNDARIES
In establishing Congressional district boundaries:
(1) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory-
(2) Unless compliance with the standards in this subsection conflicts with the standards in subsection (1) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
(3) The order in which the standards within sub-sections (1) and (2) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

. Moreover, we recently condemned use of the ambiguous phrase "millions of dollars” in a financial impact statement:
[T]he vague reference to "significant costs” and "millions of dollars” is problematic. According to the revised statement, the cost of implementation of the amendment could be anywhere from $2 million to $999 million. Such imprecise terminology would lead citizens to believe that the implementation of the amendment would automatically cost hundreds of millions of dollars. As a result, citizens may vote against the amendment, not because they do not wish to have a voice with regard to the amendment of local government land use plans, but solely because of fear generated by the misleading statement concerning the potential economic consequences of the amendment.
Advisory Op. to Att’y Gen. re Referenda Required for Adoption & Amendment of Local Gov’t Comprehensive Land Use Plans, 992 So.2d 190, 193 (Fla.2008).

. Although the dissent may disagree with this conclusion, it — like the Conference — completely fails to explain how redistricting under the new guidelines will have an additional financial impact of "millions of dollars.”