CANADY, J.,
dissenting.
In this case, for the first time in the recorded history of our Republic, a court has ruled that state legislators are required to submit to interrogation in a civil case concerning their legislative activities. I dissent from this unprecedented decision — a decision which effectively abrogates the well-established common law legislative privilege and grievously violates the constitutional separation of powers. I would approve the First District Court of Appeal’s cogent decision.
I.
The legislative privilege — which the majority reduces to a matter of judicial discretion — is firmly rooted in the English common law and inherent in the constitutional separation of powers. In Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the United States Supreme Court explained the historical origins of the privilege.
The privilege of legislators to be free from ... civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries .... In 1689, the Bill of Rights declared in unequivocal language: “That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament.”
Id. at 372, 71 S.Ct. 783 (quoting 1 Wm. & Mary, Sess. 2, c.II). Central elements of the Bill of Rights of 1689 were a provision abolishing the royal suspending power— that is, the monarch’s asserted power to suspend the operation of laws without the consent of Parliament — and the provision recognizing the legislative privilege. “Together, the two provisions preserved the freedom of legislative debate and the force of legislative enactment, thus assuring the functional independence of Parliament in a *157 system of separate powers.” Robert J. Reinstein & Harvey A. Silverglate, Legislative Privilege and the Separation of Powers, 86 Harv. L.Rev. 1113, 1135 (1973). Along with the other provisions of the English Bill of Rights, Magna Charta, and the writ of habeas corpus, the legislative privilege stands as a component in “a towering common law lighthouse of liberty.” Boumediene v. Bush, 553 U.S. 723, 845, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (Scalia, J., dissenting) (quoting Akhil Reed Amar, Sixth Amendment First Principles, 84 Geo. L.J. 641, 663 (1996)). The legislative privilege undeniably is one of “the presuppositions of our political history.” Tenney, 341 U.S. at 372, 71 S.Ct. 783.
As Tenney recognizes, “[t]he claim of an unworthy purpose does not destroy the privilege.” 341 U.S. at 377, 71 S.Ct. 783. The privilege exists so that legislators will be “immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good.” Id. “The privilege would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury’s [or judge’s] speculation as to motives.” Id. Any impairment of the legislative privilege threatens both to undermine the ability of legislators to carry out their constitutional duties and to weaken the constitutional separation of powers.
The autonomy of the core internal operations of the legislative branch is a bulwark of the separation of powers. That autonomy is violated by the intrusion of the judicial branch into the internal operations of the legislative process. When the constitutional autonomy of one branch is breached by another branch, the separation of powers is violated. Florida law has recognized that the judicial branch should not intrude into the internal operations of the legislative branch. “Florida courts have full authority to review the final product of the legislative process, but they are without authority to review the internal workings of [the Legislature].” Fla. Senate v. Fla. Pub. Emps. Council 79, 784 So.2d 404, 409 (Fla.2001); see also Moffitt v. Willis, 459 So.2d 1018, 1022 (Fla.1984) (rejecting judicial inquiry into “the propriety and constitutionality of certain internal activities of members of the legislature”).
Due respect for the separation of powers precludes the judicial branch from requiring that legislators and legislative employees submit to an inquisition conducted to ferret out evidence of an improper purpose in the legislative process. As the Supreme Court stated in Tenney, the view that it is “not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned.” 341 U.S. at 377, 71 S.Ct. 783 (citing Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 130, 3 L.Ed. 162 (1810)). Courts are highly sensitive to the fact that “judicial inquiries into legislative ... motivation represent a substantial intrusion into the workings of [an]other branch[ ] of government.” Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 268 n. 18, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). That is why the majority has been unable to cite any decision in which a legislator has been required to provide testimony in a civil case regarding the legislative process. The best that the petitioners offer is an unreported federal trial court order compelling a legislative staff member to submit to a deposition. See Baldus v. Members of Wis. Gov’t Accountability Bd., 2011 WL 6122542 (E.D.Wis.2011).
Contrary to the majority’s suggestion, Tenney’s recognition of the important purpose of the legislative privilege is by no means undermined by United States v. *158 Gillock, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), where the Supreme Court held that the legislative privilege was not applicable in a federal criminal prosecution of a state legislator. In Gil-lock, the Supreme Court reasoned that “the separation of powers doctrine! ] gives no support to the grant of a privilege to state legislators in federal criminal prosecutions” because “federal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch.” 445 U.S. at 370, 100 S.Ct. 1185.
Given “the absence of a constitutional limitation on the power of Congress to make state officials, like all other persons, subject to federal criminal sanctions,” the Supreme Court concluded that no basis existed “for a judicially created limitation that handicaps proof of the relevant facts.” Id. at 374, 100 S.Ct. 1185 (emphasis added). Gillock thus does not address the role that the legislative privilege plays in the separation of powers between the legislative and judicial branches. Instead, Gillock is a case about the scope of federal legislative power vis-a-vis state legislators. In Gillock, the recognition of the legislative privilege would have required “a judicially created limitation” impinging on the prosecution of federal offenses created by Congress. Here, however, it is the majority’s failure to honor the legislative privilege that has required “a judicially created limitation” on the legislative privilege — a privilege that is rooted in the English common law and inherent in the constitutional separation of powers.
The absence of persuasive authority justifying the compelled deposition of state legislators was recently recognized by Judge Robert L. Hinkle in Florida v. United States, 886 F.Supp.2d 1301 (N.D.Fla.2012), a case arising under section 5 of the Voting Rights Act of 1965, 42 U.S.C. §§ 1973(a)-1973(q) (2006). Although Judge Hinkle recognized that in Voting Rights Act cases, as in equal protection cases, “the critical question often is whether the legislature acted with a discriminatory purpose,” he held that legislators and legislative staff could not be compelled to testify. He observed:
The considerations that support the result include the burden that being compelled to testify would impose on state legislators, the chilling effect the prospect of having to testify might impose on legislators when considering proposed legislation and discussing it with staff members, and perhaps most importantly, the respect due a coordinate branch of government. Legislators ought not call unwilling judges to testify at legislative hearings about the reasons for specific judicial decisions, and courts ought not compel unwilling legislators to testify about the reasons for specific legislative votes. Nothing in the Voting Rights Act suggests that Congress intended to override this long-recognized legislative privilege.
Florida, 886 F.Supp.2d at 1303.
II.
The majority recognizes “that a legislative privilege exists in Florida, based on the principle of separation of powers codified in article II, section 3, of the Florida Constitution” but concludes “that this privilege is not absolute and may yield to a compelling, competing interest.” Majority op. at 143. The majority holds that a compelling, competing interest is operative here because with the passage of article III, section 20, Florida Constitution, “ ‘the framers and the voters clearly desired more judicial scrutiny’ of the [redistricting] plans, ‘not less.’ ” Majority op. at 148 (quoting Fla. House of Representatives v. League of Women Voters of Fla., 118 So.3d *159 198, 205 (Fla.2013)). The majority adopts a “balancing approach” — applicable to both depositions and document production — under which “most information or communications regarding the congressional [redistricting] process” are discoverable, but the “thoughts or impressions of individual legislators and legislative staff members” are not subject to discovery “at this stage of the litigation.” Majority op. at 151. The majority also holds that “any common law legislative privilege has been abolished by” the Florida Evidence Code. Majority op. at 144.
The majority’s conclusion that the common law legislative privilege has been abolished is unwarranted. Section 90.501, Florida Statutes (2013), which the majority relies on to support this conclusion, simply provides that no evidentiary privilege exists other than those “provided by [chapter 90], any other statute, or the Constitution of the United States or of the State of Florida.” The English common law legislative privilege, however, is given the force of law in Florida by the terms of another statute. Section 2.01, Florida Statutes (2013), provides that the general “common and statute laws of England ... down to the 4th day of July, 1776, are declared to be in force in this state” to the extent they are “not inconsistent with the Constitution and laws of the United States and the acts of the Legislature of this state.” Section 90.501 does nothing to abolish any privilege established in Florida law by section 2.01. By the plain terms of section 2.01, the legislative privilege contained in the Bill of Rights of 1689 is in force under Florida law.
The majority is correct in acknowledging that the legislative privilege is inherent in the separation of powers under Florida’s Constitution. But the majority errs in reducing the constitutional legislative privilege to a matter of unfettered judicial discretion. Like the presumption of constitutionality historically applied to redistricting plans passed by the Florida Legislature but effectively abrogated by this Court last year, what now remains of the legislative privilege in this context promises to be swiftly vanishing. There is an unmistakable signal in the majority’s statements that the “thoughts or impressions of individual legislators and legislative staff members” are not discoverable “at this stage of the litigation ” and that the circuit court “is not constrained by [the majority’s] opinion from considering, as discovery proceeds, how a specific piece of information protected by the privilege fits into this balancing approach” adopted by the majority. Majority op. at 151 (emphasis added). To the extent that the improper motivations of individual legislators are a legal basis for determining that a constitutional violation by the Legislature has occurred — a point the majority assumes but does not establish — it is unclear what rationale exists for holding that the “thoughts and impressions” of individual legislators are protected from discovery. It would seem to be axiomatic that an individual’s improper motivation will be reflected in that individual’s “thoughts and impressions.” Although the majority adopts the thoughts-and-impressions limitation “at this stage of the litigation,” the majority certainly has not articulated a specific rationale for the limitation. Majority op. at 151. The tenuousness of the limitation is manifest; there is no reason to believe that the limitation will long survive.
The majority’s balancing approach boils down to the exercise of unfettered judicial discretion: the legislative privilege inherent in the separation of powers will give way to the extent that an entirely subjective judicial determination requires that the privilege must give way. This is not the way that one branch of government *160 should approach the acknowledged constitutional privilege of an equal and coordinate branch of government. When the judicial branch is called on to consider the scope of a privilege granted by the Constitution to another branch of government, it is incumbent upon the judicial branch to articulate clearly grounded, objective rules that can be applied without the suggestion that the coordinate branch’s privilege is subject to diminishment or abrogation through the unfettered discretion of judges. At no time would it be more appropriate to pay heed to the maxim that “he is the best judge who leaves the least to his own discretion.”[16] In a context such as this — where the internal functioning of a coordinate branch of government is at issue — due respect for the separation of powers requires that judicial restraint be at its zenith. Unfortunately, the balancing approach adopted by the majority represents the nadir of judicial restraint.
Nothing in article III, section 20, justifies this evisceration of the constitutional legislative privilege. The majority’s assertion that the constitutional legislative privilege is restricted by the desire of the voters for “more judicial scrutiny” is based purely on supposition. Majority op. at 148. The text of article III, section 20, provides directives to the Legislature regarding the redistricting process but says nothing about judicial scrutiny or the legislative privilege. Therefore, any impact of the adoption of this constitutional provision on the constitutional legislative privilege could arise only by implication. But the annulment or the fundamental alteration of an essential component of the constitutional separation of powers does not properly arise by implication. See Jackson v. Consol. Gov’t of City of Jacksonville, 225 So.2d 497, 500-501 (Fla.1969) (“[I]t is settled that implied repeal of one constitutional provision by another is not favored, and every reasonable effort will be made to give effect to both provisions. Unless the later amendment expressly repeals or purports to modify an existing provision, the old and new should stand and operate together unless the clear intent of the later provision is thereby defeated.”)
The view adopted by the majority works a radical change in the relationship between the judicial branch and the legislative branch by thrusting judicial officers into the internal workings of the legislative process. Such a radical alteration in the operation of the separation of powers should not be accomplished absent the clear assent of the people of Florida. No such assent was manifested by the adoption of article III, section 20. Nothing in the text of the proposed amendment— much less the ballot summary — informed the voters that this alteration would be a consequence of the adoption of the amendment by the people. When the validity of the ballot summary was under consideration in this Court, the sponsor of the proposed amendment argued that the proposal “changes no judicial functions whatsoever” and has “no effects on judicial functions.” Amended Answer Brief of Sponsor at 7, 15 n. 2, Advisory Op. to Atty. Gen. re Standards for Establishing Legislative District Boundaries (Legislative District Boundaries), 2 So.3d 175 (Fla.2009) (emphasis added). The Court’s plurality opinion approving the ballot summary concluded that the proposed amendment “dofes] not alter the functions of the judiciary.” Legislative District Boundaries, 2 So.3d at 183 (emphasis added). But now the Court has effectively accepted *161 the petitioners’ argument in this case that “[a]rticle III, section 20, revised the balance of powers in the redistricting context” and created a “new arrangement ” requiring an aggressive judicial role. Petitioners’ Initial Brief on the Merits at 19, League of Women Voters of Fla. v. Fla. House of Representatives, No. SC13-949, review granted, 122 So.3d 868 (Fla.2013) (table) (emphasis added). A revision of the “balance of powers” between the judicial and legislative branches should not be brought about by stealth.
III.
In its treatment of the legislative privilege, the majority damages one of the “presuppositions of our political history.” Tenney, 341 U.S. at 372, 71 S.Ct. 783. I dissent from this further unwarranted judicial encroachment on the Legislature’s exercise of its constitutional authority to adopt redistricting plans. The decision of the First District should be approved.
POLSTON, C.J., concurs.

. From the Latin maxim Optimus judex qui minimum sibi. Black’s Law Dictionary 1858 (9th ed. 2009).